UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DANIEL G. WRIGHT,

      Petitioner,

v.

SECRETARY, FLORIDA
DEPARTMENT OF
CORRECTIONS, et al.,

      Respondents.

CASE NO. 3:20-cv-777-BJD-JBT

## **ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS**

Respondents, by and through undersigned counsel, respond to Petitioner's petition for writ of habeas corpus as follows. This answer is submitted pursuant to McBride v. Sharpe, 25 F.3d 962 (11th Cir. 1994), and relies solely upon court records for its factual assertions. For the reasons set forth, *infra*, Petitioner is not entitled to habeas corpus relief.

## PROCEDURAL HISTORY

Petitioner was charged with various crimes in Nassau County Circuit Court Case Nos. 2014-CF-431 and 2014-CF-558 involving two minor victims. (Ex. A, 69-70, 144-151).

On November 13, 2015, Petitioner entered a negotiated plea in both cases to Counts 1, 3, 5 and 6 in Case No. 2014-CF-431, and to all 34 counts in Case No. 2014-CF-558, with the agreement that the trial judge would have discretion to sentence him to between 10 and 20 years in prison followed by a length of sex offender probation. (Exs. A, 266-269; H).

On February 22, 2016, the trial court sentenced Petitioner as follows:

### Case No. 2014-CF-431 (Victim M.W.)

Counts 1, 3, 5:     Sexual battery upon a person 12 years of age or older but less than 18 years of age by a person in familial or custodial authority – concurrent terms of 20 years in prison followed by sex offender probation for life on each count, to run concurrently with the sentence in Case No. 2014-CF-558.

Count 6:     Tampering with evidence by directing the victim M.W. to delete photographs with the purpose to impair their availability in the investigation – 5 years in prison followed by sex offender probation for life, to run concurrently with the other counts in the case and concurrently with the sentence in Case No. 2014-CF-558.

## <u>Case No. 2014-CF-558 (Victim H.W.)</u>

Counts 1-3:   Transmission of material harmful to minors (videos of Petitioner masturbating) – concurrent terms of 5 years in prison followed by sex offender probation for life, to run concurrently with the sentence in Case No. 2014-CF-431.

Counts 4-34:   Possession of materials depicting sexual conduct by a child (child pornography) – concurrent terms of 15 years in prison followed by sex offender probation for life, to run concurrently with the sentence in Case No. 2014-CF-431.

(Exs. A, 401-425, 426-605; E).[1]

Petitioner appealed, through counsel filing an initial brief raising one claim of error:

> THE TRIAL COURT ERRED IN REFUSING TO CONSIDER MITIGATION IN THE SENTENCING HEARING BECAUSE A SENTENCING RANGE HAD BEEN ESTABLISHED BY A NEGOTIATED PLEA. IF APPELLANT IS DENIED RELIEF UNDER THIS CLAIM, HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION AS WELL AS THE CORRESPONDING PROVISION OF THE FLORIDA CONSTITUTION WILL BE VIOLATED.

(Ex. L).  The State filed an answer brief. (Ex. M).  A reply brief was filed. (Ex. N).

On July 27, 2017, the First District Court of Appeal (1st DCA) affirmed per curiam without a written opinion, with the mandate issuing August 17, 2017. (Exs. O, P).

---

[1]The State nolle prossed Counts 2 and 4 in Case No. 2014-CF-431. (Ex. E, 121).

Wright v. State, 228 So. 3d 561 (Fla. 1st DCA 2017)(1D16-1370). No further review was sought.

On October 24, 2018, Petitioner filed a motion to correct illegal sentence pursuant to Florida Rule of Criminal Procedure 3.800(a) challenging his sentences in both trial court case numbers. The following three claims were raised: (1) the probationary sentence of life exceeds the maximum term allowable by law in Count 6 of Case No. 2014-CF-431 (third-degree felony) and all 34 counts in Case No. 2014-CF-558 (second and third-degree felonies); (2) multiple conditions of probation are illegal as having no relationship to crimes of conviction, relate to conduct which is not itself criminal, and forbid or require conduct which is not reasonably related to future criminality; and (3) the special condition of probation prohibiting access to computer services and social media violates the First Amendment. (Ex. Q).

On February 21, 2019, the trial court entered an order granting in part and denying in part the 3.800 claims. Specifically, as to Ground 1 the court granted the motion, finding that the split sentences imposed on Count 6 of Case No. 2014-CF-431, and all 34 counts in Case No. 2014-CF-558, were illegal as exceeding the maximum period of incarceration permissible for second and third-degree felonies. The judge directed the clerk of court to enter an amended judgment and sentence for Count 6 in 2014-CF-431 eliminating that portion of the sentence placing Petitioner

on sex offender probation. As to 2014-CF-558, the judge directed the clerk of court to enter an amended judgment and sentence for Counts 1 through 34 eliminating that portion of each sentence placing Petitioner on sex offender probation. The court ordered that the portions of the sentences imposing incarceration shall remain the same, and that the sentences imposed in Counts 1, 3 and 5 in 2014-CF-431 shall remain the same. The court denied the remaining grounds raised in the 3.800 motion. (Ex. R). On June 14, 2021, an amended judgment and sentence was entered, nunc pro tunc to February 22, 2016. (Ex. S).

On March 4, 2019, Petitioner filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 raising six claims. (Ex. T, 48-90). On May 20, 2019, the trial court summarily denied the motion attaching portions of the record in support of its findings of fact and conclusions of law. No evidentiary hearing was conducted. (Ex. T, 92-674). Petitioner appealed, through counsel filing an initial brief. (Ex. U). The State filed a notice that no answer brief would be filed. (Ex. V). On May 19, 2020, the 1st DCA affirmed per curiam without a written opinion. (Ex. W). Petitioner's motion for rehearing and issuance of a written opinion (Ex. X), was denied. (Ex. Y). The mandate issued July 16, 2020. (Ex. Z). Wright v. State, 297 So. 3d 525 (Fla. 1st DCA 2020)(1D19-2490).

Petitioner filed his federal habeas petition on July 13, 2020. (Doc. 1). By Respondents' calculations, the petition is timely. Respondents have found no record of United States District Judge Brian J. Davis or United States Magistrate Joel B. Toomey having been involved in any of the state court proceedings.

## EXHAUSTION AND PROCEDURAL DEFAULT

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(c). The petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989). To properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

Pursuant to the procedural default doctrine, a state prisoner seeking federal habeas corpus relief who fails to raise his federal constitutional claim in state court, or who attempts to raise it in a manner not permitted by state procedural rules, is barred from pursuing the same claim in federal court absent a showing of cause for and actual prejudice from the default, Wainwright v. Sykes, 433 U.S. 72, 87 (1977),

or the kind of fundamental miscarriage of justice occasioned by a constitutional violation that resulted in the conviction of a defendant who is "actually innocent," as contemplated in Murray v. Carrier, 477 U.S. 478, 496 (1986). The "cause" excusing the procedural default must result from some objective factor external to the defense that prevented the prisoner from raising the claim and which cannot be fairly attributable to his own conduct. Id. at 488.

The fundamental miscarriage of justice exception concerns a petitioner's "actual" innocence rather than his "legal" innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (2001) (citing Calderon v. Thompson, 523 U.S. 538 (1998)); Murray v. Carrier, 477 U.S. at 495-496 (explaining that a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent")(citation omitted). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. Schlup v. Delo, 513 U.S. 298, 327 (1995). In addition, to be credible, a claim of actual innocence must be based on new reliable evidence not presented at trial. Id. at 324.

Respondents will address under each claim whether Petitioner exhausted his state court remedies.

## GOVERNING FEDERAL HABEAS PRINCIPLES

**A.  Cognizable Federal Claim**

A habeas petition cannot be granted based on a state court interpretation or misinterpretation of state law.  Pulley v. Harris, 465 U.S. 37 (1984); Wainwright v. Goode, 464 U.S. 78 (1983). The United States Supreme Court reiterated this principle in Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), stating that, "we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  The Eleventh Circuit Court of Appeals has emphasized that the federal courts are not super appellate courts entitled to review state court interpretations of state law. Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983); Carrizales v. Wainwright, 699 F.2d 1053 (11th Cir. 1983).

**B.  Standard Under AEDPA**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003)(citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective

assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the defendant in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

Failure to establish either prong of the Strickland standard will result in denial of a defendant's Sixth Amendment claim. Aldrich v. Wainwright, 777 F.2d 630 (11th Cir. 1985). Unless a claimant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable. Strickland, 466 U.S. at 687. Thus, where a petitioner has failed to demonstrate one prong of the Strickland standard, it is unnecessary to determine whether the other prong has been established. Id., at 697 (court may consider performance and prejudice components in any order, and need not address both if petitioner fails to make the requisite showing as to one). A petitioner has the burden of proof on his ineffectiveness claims, Holsey v. Warden, 694 F.3d 1230, 1256 (11th Cir. 2012), as well as the burden of proof under § 2254(d), Pinholster, 563 U.S. at 181.

The Strickland test for evaluating claims of ineffective assistance of counsel applies to ineffective assistance claims arising out of the plea process. Hill v.

Lockhart, 474 U.S. 52, 57 (1985). The prejudice prong focuses on whether counsel's deficient performance affected the outcome of the plea process; thus, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. Id. at 58-59.

The standard created by Strickland is a highly deferential standard, requiring a most deferential review of counsel's decisions. Richter, 562 U.S. at 105. Not only is there the Strickland mandated one layer of deference to the decisions of trial counsel, there is the added layer of deference required by AEDPA: the one to a state court's decision. Nance v. Warden, Ga. Diagnostic Prison, 922 F.3d 1298 (11th Cir. 2019). Thus,

> Given the double deference due, it is a "rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." Johnson v. Sec'y, DOC, 643 F.3d 907, 911 (11th Cir. 2011). And, for the reasons we have already discussed, it is rarer still for merit to be found in a claim that challenges a strategic decision of counsel.

Id. at 1303.

Application of the foregoing principles of federal habeas corpus review establishes that Petitioner is not entitled to issuance of the writ in the instant case.

**GROUND ONE: "DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO PRESENT EVIDENCE AND ARGUMENT AT THE SENTENCING HEARING TO REBUT THE PROSECUTOR'S MATERIAL FACTUAL MISREPRESENTATION REGARDING THE AGE OF H.W. DURING THE TIME FRAME WHEN THE PHOTOGRAPHS/VIDEOS WERE EXCHANGED WITH PETITIONER WRIGHT."**

PETITIONER'S CLAIM

Petitioner alleges that his trial counsel was ineffective for failing to present evidence and argument at the sentencing hearing to rebut the prosecutor's material factual misrepresentation regarding the age of H.W. during the time frame when the sexually explicit photographs and videos were exchanged between H.W. and Petitioner. Petitioner alleges that because there is a reasonable probability he would have received a lesser sentence than the absolute maximum he received under the plea bargain but for counsel's failure to challenge the prosecutor's misrepresentation, he is entitled to a new sentencing hearing. Petitioner asserts that the state court's ruling denying this claim is contrary to and an unreasonable application of Strickland, and is based on an unreasonable determination of the facts in light of the evidence contained in the state court record.

A. <u>EXHAUSTION OF STATE REMEDIES</u>

Petitioner raised this claim as Ground One of his postconviction motion (Ex. T, 55-64), and he appealed the denial of this claim. (Ex. U).


B. <u>ARGUMENT</u>

In Ground One of his postconviction motion, Petitioner raised the same claim of ineffective assistance of counsel he raises in Ground One of his federal habeas petition. He alleged that at the sentencing hearing the prosecutor misrepresented the age of the victim H.W. as 14 years old when Petitioner sent her videos of himself masturbating and solicited sexually explicit videos of her.  Petitioner alleged that the prosecutor argued this was evidence that Petitioner had pedophilic urges and interests, despite having been cleared by two psychosexual evaluations during the pendency of the case. Petitioner alleged that contrary to the prosecutor's representations, the evidence adduced at the <u>Williams</u>[2] rule hearing established that he did not send the videos to H.W. until after he left teaching at Hilliard High School to start a new job at Fernandina High School, which was less than four months before H.W.'s eighteenth birthday. Petitioner alleged that the defense counsel who represented him at the plea and sentencing proceedings (Mark O' Mara) was

_____

[2]<u>Williams v. State</u>, 110 So. 2d 654 (Fla. 1959).

unfamiliar with the material facts of the case (in particular the evidence adduced at the <u>Williams</u> rule hearing where Petitioner was represented by previous counsel) and failed to object to the prosecutor's misrepresentation of H.W.'s age. Petitioner alleged that had defense counsel corrected the prosecutor's misrepresentation to reflect H.W. was not 14 years old during the relevant time period but had reached the age of 17, then the trial judge would likely have considered more seriously the evaluations of the two psychologists who opined in written reports that Petitioner had no pedophilic tendencies. Petitioner alleged that the material misrepresentation by the prosecutor on this point had a profound effect on the entire sentencing proceeding as evidenced by the judge's explicit statements in explaining his rationale for the sentence he imposed. Petitioner alleged that given the gravity of this failure of counsel at sentencing, this instance rose to a presumption of prejudice and per se ineffectiveness under <u>United States v. Cronic</u>, 466 U.S. 648 (1984). Petitioner alleged that because there is a reasonable probability he would have received a lesser sentence than the absolute maximum that he received under the plea bargain but for counsel's failure to challenge the prosecutor's misrepresentation, he is entitled to a de novo resentencing hearing. (Ex. T,  55-64).

The postconviction court, after citing the controlling <u>Strickland</u> standard, summarily denied this claim as follows:

<u>GROUND ONE</u>

In Ground One, Defendant argues that his attorney was ineffective because he failed to object to or otherwise rebut certain remarks the State made during Defendant's sentencing hearing. The statements at issue concern the age of one of Defendant's victims. Specifically, Defendant alleges the prosecutor implied that the victim was fourteen-years-old at the time Defendant first sent masturbation videos to her cellular phone. Defendant argues that, at the time of his sentencing, it had been established that the victim was seventeen-years-old when Defendant first sent those videos to her.

The prosecution remarks at issue in Ground One are identical to those at issue in Ground Two. For the reasons this Court sets forth below, it is not at all clear that the prosecutor's remarks were improper when viewed in the full context of Defendant's case. In the absence of such impropriety, defense counsel had no basis to object in the manner Defendant now advocates. <u>See</u> <u>Hitchcock v. State</u>, 991 So. 2d 337, 361 (Fla. 2008) ("Counsel cannot be deemed ineffective for failing to make a meritless objection."). Moreover, as this Court explains below, to whatever extent the prosecution remarks were somewhat misleading, no prejudice to Defendant could have resulted therefrom. And in the absence of such prejudice, Defendant's claim necessarily fails. <u>See</u> <u>Strickland</u>, 466 U.S. at 688. Accordingly, this Court denies Ground One of Defendant's motion.

(Ex. T, 94). Inasmuch as the court referenced its ruling in Ground Two, that ruling

is set out below:[3]

---

[3]In the postconviction order, the initials of the two victims are redacted. (Ex. T, 92-105). Respondents have a copy of the unredacted order and have inserted the victims' initials so that there will be no confusion. H.W. was referred to interchangeably as the Hilliard victim in the state court proceedings.

- 16 -

## GROUND TWO

In Ground Two, Defendant argues that the State committed a Giglio violation during Defendant's sentencing hearing. Defendant maintains that the prosecutor falsely stated the age of one of Defendant's victims. Defendant's argument fails for a number of reasons.

As a threshold matter, this Court notes that Giglio addresses false *testimony*, not allegedly false argument. In Giglio, the United States Supreme Court held that a criminal defendant is entitled to a new trial if the prosecution knowingly puts forth false, material testimony. Id. at 150-55. The Florida Supreme Court has set forth the elements of a Giglio violation: "it must be shown that (1) the *testimony* given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." Guzman v. State, 941 So. 2d 1045, 1050 (Fla. 2006)(emphasis added). Although Defendant cites Guzman for the proposition that Giglio applies with equal force to prosecution argument as it does to testimony, Guzman only addresses the issue of false *testimony* and says nothing about a prosecutor's comments on evidence during an opening statement or closing argument. Indeed, Defendant does not point to any Florida District Court of Appeal or Supreme Court opinion holding that Giglio is applicable to a prosecutor's summation of evidence. In sum, Giglio is inapplicable.

With Giglio properly laid aside, it is clear that Ground Two of Defendant's motion is simply an attack on the propriety of a prosecutor's remark. Claims of improper prosecutor remarks are not cognizable in a motion for postconviction relief. See Johnson v. State, 985 So. 2d 1215, 1215 (Fla. 1st DCA 2008); House v. State, 199 So. 2d 134, 134 (Fla. 1st DCA 1967). As such, this Court may deny Ground Two of Defendant's motion on that basis. However, even if Defendant's claim were cognizable in a postconviction motion, the record shows that it is without merit.

Near the conclusion of Defendant's sentencing hearing, the court permitted each side to make an argument about what sentence the court should impose. (Ex. D beginning at 78.) The portion of

the State's argument with which Defendant takes issues began as follows:

> MS. THURSON [For the State]: That is someone who, in their core, doesn't know that it's wrong to engage in sending masturbatory videos to a student, beginning at the age of 14. He told her he loved her. He was married. She was his 14 year old student, but he says that to everyone. . . .
>
> And I'm sure that the Court is aware of this, but I would be remiss if I didn't mention that the psychological definition of pedophile is different than the criminal one. Psychologically, because the victims were postpubescent, he's not a pedophile, but that's not our legal definition. Our legal definition is these victims were minors. He was in a custodial position. With [H.W.] she was 14, 15, 16. And so criminally and in our society he is a pedophile. . . .
>
> As far as help, Daniel needs to help himself, which he has not done, and to argue to the Court that he's learned his lesson because he hasn't gotten in any trouble in almost a year in the jail, well his thing is minor girls. He's not having access to minor girls. It took several contempt orders and solitary confinement to stop him from accessing the minor girls.

(Ex. D at 80, 102.)

These comments are, at least in the main, a fair comment on the record. See Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985) ("The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.") At a Williams rule hearing, victim [H.W.] testified that her date of birth is [August 18, 1995]. (Ex. E at 8.) Defendant was one of [H.W.'s] teachers during eighth, ninth, and tenth grades. (Ex. E at 9.) She was fourteen years of age at the time she and Defendant "began texting and messaging and calling each other." (Ex. E at 10.) Defendant first informed [H.W.] that he loved her when [H.W.] was fourteen-years-old. (Ex. E at 13.) She was

about fifteen when Defendant solicited a picture of her in her bra. (Ex. E at 11-12.) [H.W.] was still a minor when she and Defendant began exchanging more graphic, explicit sexual content via cellphone. (Ex. E.)

At the same Williams rule hearing, Investigator Brian Barnhart testified that he found pornographic images of [H.W.] saved on Defendant's phone. (Ex. E at 39.) Defendant's phone contained at least two videos, created in April and May of 2013, respectively, of Defendant masturbating and providing explicit commentary thereto. (Ex. E at 45-48.) Defendant sent those videos to [H.W.] (Ex. E at 45-48.)

During Defendant's plea hearing, the State provided the court with a factual basis for Defendant's plea. (Ex. F at 20-21.) *Inter alia*, the State informed the court:

> MS. THURSON [For the State]: As to case 2014-CF-558, the State would be prepared to prove at trial beyond a reasonable doubt as to counts one through three that between August 18th, 2011, and August 17th of 2013 in Nassau County, Florida, that the defendant did knowingly transmit videos of himself masturbating to the Hilliard victim [H.W.] who is known to him to be a minor. She was his student or former student. Further, as to counts four through thirty four, between the dates of October 1st, 2012 and June 16th 2014, in Nassau County, Florida, that the defendant did knowingly possess photos and videos he knew included sexual conduct by the child who we've alleged as Hilliard victim and possessed ten or more images of child pornography, one or more of which was a movie involving child pornography.

(Ex. F at 21.)

The trial court asked defense counsel whether there was any exception or objection to the State's factual basis. Defense counsel informed the trial court that there was none. (Ex. F at 21.)

At the sentencing hearing, [H.W.'s] mother testified that Defendant "preyed upon [her] daughter for years, beginning in 2010 – while she was a fourteen-year-old middle school student in his classroom." (Ex. D at 7.) Major Connie W. Johnson of the Nassau County Sheriff's Office testified that Defendant had to be moved within the Nassau County Detention Facility because he violated the trial court's order not to contact either of the victims in this case. (Ex. D at 29-30.) Indeed, the record shows that Defendant violated the trial court's order by telephoning victim [M.W.] on at least nine occasions and by writing letters to [M.W.] (Ex. G and Ex. H.) At sentencing, Defendant conceded, *inter alia*, that it is inappropriate for a teacher to have a sexual relationship with a fourteen, fifteen, or sixteen-year-old student. (Ex. D at 64-65.) Defendant also conceded that he omitted details of his relationship with [H.W.] from Dr. Neidigh (who completed a psychosexual evaluation of Defendant in advance of sentencing). (Ex. D at 55-56.)

These facts demonstrate that the remarks Defendant now takes issue with are, at least principally, fair comments on the record evidence. Moreover, to whatever extent the comments interjected some ambiguity into [H.W.'s] exact age at the precise time Defendant sent her videos of Defendant masturbating, there is no question that [H.W.] was a minor at the time Defendant sent the videos. Likewise, there is no question that Defendant began frequently communicating with [H.W.] outside of school hours when she was fourteen years of age and that Defendant expressed his love for [H.W.] at that same time. Defendant solicited a picture of [H.W.] in her undergarments at the time [H.W.] was fifteen-years-old. Finally, there is no question that Defendant sexually battered a second underage student-victim, [M.W.] (Ex. A; Ex. D at 55; Ex. F at 20.)  Defendant wants this Court to believe that the prosecution remarks at issue poisoned his sentencing hearing. However, the undisputed facts set forth above demonstrate that the prosecution comments could not have prejudiced Defendant. Additionally, the same Judge presided over Defendant's case throughout all of its critical stages, and was therefore well

> acquainted with the relevant timeline of Defendant's conduct prior to sentencing Defendant.
>
> In sum, Ground Two is both procedurally barred and without merit. As such, this Court denies Ground Two of Defendant's motion.

(Ex. T, 94-98)(emphasis in original). The court attached the referenced records to its order. (Ex. T, 107-674). The 1st DCA affirmed per curiam without a written opinion. (Ex. W).

The postconviction court's findings are supported by the transcripts of the plea hearing (Ex. H), the Williams rule hearing (Ex. J), and the sentencing hearing (Ex. E). To fully consider the claim in Ground One (as well as Ground Two), it is necessary to review the underlying facts and procedural history of the case. Petitioner taught at Hilliard Junior High School from 2007 to 2012, and at Fernandina Beach High School from 2012-2014. It was during his time at Fernandina High that he engaged in the activities that resulted in the sexual battery charges against victim M.W. in 2014-CF-431. He was arrested in that case on June 14, 2014. (Ex. A, 1-4). In the investigation of Petitioner's unlawful activities with M.W., the State searched his phone and computer and discovered photographs and videos that were later determined to depict a second minor victim, H.W., in various positions of nudity and engaged in sex acts with her boyfriend. Also discovered were videos Petitioner sent

to H.W. of himself masturbating. The crimes involving H.W. resulted in separate charges being filed in 2014-CF-558.

The State elected to take 2014-CF-431 to trial first. Throughout the proceedings, Petitioner was represented by several different attorneys. In June 2014, Christopher Wilson was first to file a notice of appearance and written plea of not guilty. (Ex. A, 5, 11). Shortly thereafter, Gary Baker filed a notice of appearance indicating that all further correspondence and communications should be directed to him. Mr. Baker also filed a plea of not guilty on behalf of Petitioner. (Ex. A, 12, 13, 47). In August 2014, Mr. Wilson filed a notice of appearance as co-counsel of record. (Ex. A, 59).

On January 17, 2015, in 2014-CF-431 the State filed a notice of other crimes, wrongs, or acts, to wit: that Petitioner engaged in inappropriate sexual activity with H.W. (Ex. A, 130). On February 23, 2015, Mr. Wilson filed a motion to strike the notice of other crimes, wrongs, or acts. (Ex. A, 137-139).

On March 3, 2015, William Mallory Kent filed a notice of appearance as co-counsel. (Ex. A, 140-141, 142-143).

On June 9, 2019, the State filed in 2014-CF-321 an amended notice of other crimes, wrongs, or acts evidence. (Ex. A, 179). On July 6, 2015, the State filed a second amended notice of other crimes, wrongs, or acts evidence. (Ex. A, 186).

On July 8, 2015, a <u>Williams</u> rule hearing was conducted at which Mr. Baker appeared on behalf of Petitioner. The court issued an oral ruling admitting the

<u>Williams</u> rule evidence and denying the defense's motion to strike the evidence. (Ex. J).

On October 14, 2015, attorneys Mark M. O'Mara and Teresa J. Sopp of the O'Mara Law Group filed a notice of appearance as co-counsel. (Ex. A, 265). At a short hearing conducted on November 4, 2015, Mr. Wilson informed the judge that he was filing a motion to withdraw and that Petitioner was consenting to his withdrawing from the case. The judge announced that an order of withdrawal would be entered. (Ex. G, Volume XX).

One month later, on November 13, 2015, Petitioner signed the written plea in both cases. (Ex. A, 266-269). The only attorneys appearing on behalf of Petitioner at the plea hearing and at sentencing were Mr. O'Mara and Ms. Sopp. (Ex. H).

At the <u>Williams</u> rule hearing, H.W. testified that she was currently 19 years old. (Ex. J, 8).  She attended Hilliard Middle School and Hilliard High School. (Ex. J, 9). Petitioner was her teacher in the 8th, 9th and 10th grades. (Ex. J, 9). She testified that the two of them did not have a normal teacher/student relationship. (Ex. J, 9). They communicated outside of school via cell phone calls and text messages.  (Ex. J, 9-10). H.W. stated she was 14 when this communication began. (Ex. J, 10). When she was in the 10th grade, Petitioner left Hilliard to teach at Fernandina High School but they continued to communicate. (Ex. J, 10).  Petitioner asked her to send him photographs,

first normal photos and then with her wearing less clothes until she was completely nude. (Ex. J, 11).  She recalls she was about 15 years old when he asked for a picture of her in her bra. (Ex. J, 11-12). She was 17 years old when she sent him the last picture of her nude. (Ex. J, 12-13). She testified she sent the photos because she thought he loved her and she loved him. (Ex. J, 13). Petitioner told her he loved her. (Ex. J, 13). The last night he said this to her was the night before he was arrested in June 2014. (Ex. J, 13). That day they had met in person and he told her he loved her and never wanted her to feel like she was nothing to him. (Ex. J, 14). On multiple occasions throughout their relationship Petitioner asked her to engage in sexual conduct with him. (Ex. J, 14). On January 21, 2013, Petitioner sent her a text message saying Poseidon (the nickname he gave to his penis) wanted to hurt every hole she had. (Ex. J, 18). On July 22, 2013, when she was 17 years old, Petitioner texted "I want to make love to your soft beautiful body. Still in love with you." (Ex. J, 18). Petitioner texted her videos of him masturbating. (Ex. J, 18-20).

On cross-examination, Mr. Baker asked H.W. if Petitioner began teaching at Fernandina High in the fall of 2012. She answered she thought he started there in 2013. (Ex. J, 21).

Q.     Would you agree with me that in that exhibit the first text messages between the two of you was in January of 2013?

A.     Yes.

Q.     So if, in fact, the records show that he started teaching in Fernandina in August of 2012, and these text messages were all after you were no longer his student, right?

A.     Yes.

Q.     Okay. Is it your recollection looking at those text messages that he sent those to you or you sent texts back to him when you were still his student?

A.     I don't recall if I was his student or not when he sent me these.

(Ex. J, 22).  Asked whether she had asked for the masturbation videos, she responded "Some were asked for and some were not asked for." (Ex. J, 23). Petitioner asked her to send him videos of her and her boyfriend having sex and she did. (Ex. J, 24).  She does not recall if Petitioner had left for Fernandina High when she sent those videos. (Ex. J, 24). She and Petitioner never had sex and he never touched her inappropriately before she turned 18. (Ex. J, 25). However, when she was under 18 years of age he did tell her he wanted to do sexual things to her. (Ex. J, 25).

The State next presented testimony of Brian Barnhart, an investigator with the State Attorney's Office. Barnhart testified that as a part of his investigative duties he performs forensic analysis of certain types of electronic evidence. (Ex. J, 29). In Petitioner's case, he analyzed cell phones, computers and hard drives. The phones were several models of iPhones. (Ex. J, 29). The phones identified the user as Petitioner. (Ex. J, 29). When Barnhart was asked by the prosecutor to explain how an

iPhone is backed up to a computer, defense counsel Gary Baker objected on the basis that the question asked for an opinion and Barnhart had not been qualified as an expert. (Ex. J, 30). The court ruled that the State would need to lay a predicate for Barnhart's knowledge, noting he probably did not qualify as an expert witness. (Ex. J, 30-31). Barnhart testified he was trained in the area of iPhones and computers:

Q.      Have you been trained on how iPhones work and computers work?

A.      Yes, I have.

Q.      Okay. And could you summarize that training?

A.      It's quite extensive. National White Collar Crime Center, they conduct training all over the country for different levels of law enforcement, state, federal, local. They have training courses where their experts teach law enforcement officers how to analyze and collect iPhone evidence, Macintosh evidence, computer evidence as well as the Federal Law Enforcement Training Center which is under the Department of Homeland Security, they do the same thing. They have a Macintosh program which covers the same topics.

Q.      Okay. So is it your opinion or is it a fact that the way you back up your iPhone is to plug it into your computer?

[Mr. Baker]:   Your Honor, I would object.

[Court]:        Legal basis.

[Mr. Baker]:   He can give an opinion but he can't say it's a fact. He is not an expert from Apple.

[Court]:        Your objection's overruled.

(Ex. J, 32).  Asked again whether it was his opinion or a fact that the way to back up an iPhone is to plug it into a computer, Barnhart answered it is a fact that is one way of doing it and that another way is backing up to the Cloud. (Ex. J, 32). Petitioner's phone had been backed up to his computer. (Ex. J, 32-33). Barnhart found text messages between H.W. and Petitioner located within the backup. (Ex. J, 33-37). The messages were introduced as State's Exhibit 3. (Ex. J, 37-38). The phone also contained pornographic photographs of H.W. texted by her to Petitioner. (Ex. J, 39-40). Barnhart testified that sometimes when a person receives a text message with a photo attached, if the person who received the text deletes the text the photo can still remain on the device as it is store elsewhere. (Ex. J, 41). State's Exhibit 2 contained videos of Petitioner masturbating. (Ex. J, 42-43). Barnhart was able to ascertain that the videos had been sent attached to a text message. (Ex. J, 43-44). The prosecutor asked Barnhart if he recalled the date or date range of the videos and Barnhart responded he did not recall. (Ex. J, 44). Asked to view the property sheet for the first captured video, Barnhart stated it was created on May 25, 2013. (Ex. J, 45). The video was played in court and Petitioner can be heard stating "You dirty fucking slut. I'm going to cum, slut. I love you."  (Ex. J, 46-47). The second video was created April 26, 2013. It was also played in court and Petitioner can be heard stating "Awe, I'm inside you. Tell me when you're there. Oh fuck."  (Ex. J, 47).  The third video was

created April 26, 2013. It was also played in court and Petitioner can be heard stating "here's my dick and here's my hand. I'm going to spit in it and jerk off, that's how it goes. You move up my cock. Tight fucking virgin ass. Fuck that little virgin ass. Fuck you so deep, so hard that you cum with me. Little asshole. I'm going to take your virgin ass. Fuck you so deep with my swollen dick. You fucking slut. Tell me you like that. Tell me you want that inside your asshole." (Ex. J, 48).

On cross-examination, defense counsel Mr. Baker asked Barnhart whether he ever saw a search warrant for this phone belonging to Petitioner. Barnhart responded that he believed he did but could not recall. (Ex. J, 51). Another investigator, Rex Rudisill, informed Barnhart it was okay for him to extract from this particular phone. (Ex. J, 51). Barnhart stated that according to the property sheet all three videos were created on April 26, 2013. (Ex. J, 51). Barnhart testified that he had never been qualified as an expert in court. (Ex. J, 52). Barnhart did not recover any pornographic photographs or videos of victim M.W., or any evidence that Petitioner sent her masturbation videos. (Ex. J, 54).  Asked why he had been asked to examine Petitioner's devices rather than having them examined by FDLE, Barnhart responded it was because he was in-house and the State Attorney's Office had the capability of doing it. (Ex. J, 55).

On redirect examination, Barnhart testified that he also discovered photos of M.W. as well as text messages on Petitioner's phones and computer. (Ex. J, 56). Barnhart clarified that the three masturbation videos sent to H.W. were found on Petitioner's computer. However, they had been backed up through his phone. (Ex. J, 56-57).  With respect to when each video was created, Barnhart testified:

Q.     Now, defense counsel told you that his recollection of the three property cards showed all the same date of 4/26/2013. Would it assist you in your recollection of the dates to look at a copy of the property?

A.     Yes.

Q.     And looking at these paper printouts of the property cards what were the dates of the videos?

A.     There's – two of them are April 26, 2013, and there's another one that's May 25, 2013.

Q.     The two that are on April 26 of 2013, were they made at the same time?

A.     No, they were not.

Q.     What is the time difference?

A.     One was created at 4:32:31 a.m.  As you see, the other one was 4:51:06 a.m. UTC.

(Ex. J, 58).

Following the testimony of Barnhart, Mr. Baker asked for clarification as to whether the only items the State was trying to introduce for purposes of this hearing

were the three videos. (Ex. J, 59). The following transpired between the prosecutor

(Donna Thurson), Mr. Baker, and the court:

[Mr. Baker]:     The only thing the State is trying to Williams Rule are the three
                 videos? Because that's all they presented today.

[Ms. Thurson]:   What the State – what the State is Williams Ruling is that the
                 defendant maintained a sexual relationship through photographs
                 and requested sexual activity with a student who then became a
                 former student. You hear his statements requesting the sexual acts
                 on those three videos. You have the victim's testimony on that,
                 although, he asked her for sexual – physical sexual conduct she did
                 not do that but she did acquiesce to his request for –

[Court]:         In other words, it's your intention to offer photographs into
                 evidence under a Williams Rule ruling if it's forthcoming that you
                 have not presented today?

[Ms. Thurson]:   No, sir. I'm trying to keep it as streamlined and keep it from being
                 a feature –

[Court]:         Right.

[Ms. Thurson]:   – as possible. I mean, I don't have any objection to some of them
                 coming in but my intention was not to put in any photographs, not
                 to put in any other physical evidence or testimony besides what the
                 Court heard today as to the Williams Rule.

[Court]:         Okay. I believe that would answer your question and confirm what
                 you were seeking to confirm.

[Mr. Baker]:     Thank you, Your Honor.

(Ex. J, 59-60).

Mr. Baker then presented the following brief testimony of Petitioner:

Q.      Mr. Wright, when did you begin teaching at Fernandina Beach High School?

A.      Fall of 2012.

Q.      And what month would that be?

A.      Towards the end of August.

(Ex. J, 62).

The court then entertained argument from the prosecutor. (Ex. J, 63-69). The prosecutor argued that Petitioner started grooming H.W. at age 14. (Ex. J, 67). The court asked whether in 2010 H.W. would have been age 14-15. (Ex. J, 69). The prosecutor responded "Yes, sir. The first text message was April 17th of 2010. She would have been 14." (Ex. J, 69). The court then heard argument from Mr. Baker. Mr. Baker asserted there were differences in the communications and actions between H.W. and M.W. (Ex. J, 71).   Mr. Baker pointed out that H.W. was no longer Petitioner's student in 2013. (Ex. J, 71). Mr. Baker argued that the prosecutor stating the State had phone records back from 2010 did not cut it as far as he was concerned, that the State needed to show what precise messages it intended to present. (Ex. J, 71, 75-76). Mr. Baker argued that the allegations were completely different with respect to M.W. and H.W. (Ex. J, 73-78). The prosecutor responded that in the videos Petitioner sent to H.W., Petitioner solicited her to have sex with him which qualifies as a sexual offense.  (Ex. J, 78-84). The court asked whether the State had provided

the defense with the content of the older text messages between H.W. and Petitioner aside from a log of texts and calls. (Ex. J, 84-85). The prosecutor responded that the State did not have the content of the older text messages. (Ex. J, 85). The prosecutor argued that Petitioner was H.W.'s teacher when he first began the contact with her at 14 years of age. (Ex. J, 86-87). Mr. Baker argued there was no way of knowing whether the earlier text messages were sexual in nature. (Ex. J, 88-92). Questioning from the judge continued and further argument ensued. (Ex. J, 92-98). The court then issued its oral ruling, denying the defense's motion to exclude the Williams rule evidence. (Ex. J, 98-106).

Petitioner elected to enter a plea in both cases on November 13, 2015. The prosecutor provided the following factual basis:

[Prosecutor]:    Your Honor, the State would be prepared to prove at trial as to case number 2014-CF-431 the following crimes beyond a reasonable doubt: That between the dates of August 1, 2013, and May 21, 2014 in Nassau County, Florida, that this defendant while in a position of custodial authority, that being a teacher, did engage in active sexual battery with a student, his student, M.W. who was a minor at the time. There were three alleged acts that the State would be prepared to prove beyond a reasonable doubt that he placed his penis in the vagina of M.W., his mouth on the vagina of M.W. and his finger in the vagina of M.W.  Further that on June 13th, 2014, knowing of a criminal investigation by the Fernandina Beach Police Department was pending or about to be instituted, did direct M.W. to delete photographs which were evidence of counts one, three and five to impair their availability. As to case 2014-CF-558 the State would be prepared to prove at trial beyond a reasonable doubt as to counts one through three that between August 18th, 2011, and August 17th of 2013 in Nassau County,

> Florida, that the defendant did knowingly transmit videos of himself masturbating to the Hilliard victim who is known to him to be a minor. She was his student or former student. Further, as to counts 4 through 34 between the dates of October 1st of 2012 and June 16th of 2014 in Nassau County, Florida, that the defendant did knowingly possess photos and videos he knew included sexual conduct by the child who we've alleged as the Hilliard victim and possessed ten or more images of child pornography, one or more of which was a movie involving child pornography.

(Ex. H, 20-21).  Counsel Mark O'Mara interposed no exception or objection to the factual basis. (Ex. H, 21).  The court found that a factual basis existed for the plea. (Ex. H, 24).

At the sentencing hearing conducted February 22, 2016, Petitioner was represented by Mr. O'Mara and Ms. Sopp.[4]  The State first read a letter from H.W.'s mother, who was referred to at the hearing as S.W. In the letter, S.W. wrote that Petitioner preyed upon H.W. for years, beginning in 2010 when she was his 14-year-old middle school student. S.W. wrote that Petitioner established a relationship with H.W. and convinced her he was in love with her, telling her details about his failing marriage and telling H.W. he was going to marry her and move them to Australia. S.W. wrote that Petitioner sent H.W. nude photos of himself and coerced her into sending him nude photos of her, and that he shared lustful fantasies and attempted to make plans to further violate her.  S.W. wrote that at an earlier proceeding in the case

---

[4]The Honorable Adrian G. Soud presided over the Williams rule hearing, the plea hearing, and the sentencing hearing.

Petitioner had laughed at nude photos of himself in the courtroom while reviewing them with his attorneys while H.W. was on the stand. S.W. asked the judge to protect all daughters and hold Petitioner accountable for the sex crimes he committed. S.W. asked the judge to make a decision that ensures America will not tolerate pedophiles to violate children. S.W. referred to Petitioner as a deceitfully, charming, manipulative, calculating, reprobate, pedophile and child molester. (Ex. E, 7-10).

Testifying next for the State was Detective Alan Smith of the Fernandina Beach Police Department. He served as a school resource officer at Fernandina High at the time the allegations involving M.W. came to light. Detective Smith testified about his investigation of the case. Detective Smith's initial thoughts were not to throw the book at Petitioner where M.W. had been willingly involved in the sexual encounters. However, Detective Smith's initial thoughts took a dramatic turn when evidence was produced following Petitioner's arrest that revealed he had an inappropriate relationship with H.W. as well. Detective Smith stated that in one of the videos sent to H.W., Petitioner can be heard saying he wanted to stick his dick in her. Detective Smith stated that as a teacher one is entrusted with children to ensure they are safe, provided for, and taught lifelong lessons while in their care, and that what Petitioner did was unconscionable and inexcusable. Detective Smith requested that Petitioner be punished to the full extent of the law. (Ex. 10-16).

The defense then presented its witnesses in mitigation. Prior to presenting the first witness, Mr. O'Mara placed into evidence reports of two evaluations performed on Petitioner. The first is a psychosexual evaluation performed by Dr. Larry Neidigh, Ph.D., on February 13, 2015. (Ex. A, 612-626). The second is a psychological evaluation dated October 15, 2015, by Dr. Catherine Drew, Ph.D., for purposes of determining custody and visitation issues concerning Petitioner's minor children. (Ex. A, 627-630). Mr. O'Mara summarized the conclusions contained in both reports, stating there was no psychopathy to be concerned about and that Petitioner was not a danger to the community or to children.  (Ex. E, 21-26). The written reports are contained in the record. (Ex. A, 612-630).

The defense then presented Connie Johnson of the Nassau County Sheriff's Office, who is a major at the Nassau County Detention Center. Johnson was asked about her contact with Petitioner while he was in jail. She testified she was aware of some initial problems with telephone calls Petitioner placed in violation of the court's orders. She testified that once that issue was resolved he was placed back into an open cell general population. She observed no disciplinary problems and stated she observed him assisting other inmates with acclimating to jail, with library issues, and with GED instruction. (Ex. E, 26-28).  On cross-examination, Johnson testified that when Petitioner violated the order prohibiting him from contacting the victim, he had to be placed in isolation for several months and phone usage was eliminated. Even

then, Petitioner still found ways to continue to violate the no contact order. This placed additional burdens upon jail staff to read his incoming and outgoing mail. Johnson had to continue to attempt to limit Petitioner's access to other inmates who he had placing calls to the victim for him. (Ex. E, 29-30).

Mr. O'Mara then presented to the court a packet of letters submitted in support of Petitioner. (Ex. E, 31-33; Ex. A, 631-640).

Mr. O'Mara then called Petitioner's mother, Rebecca Wright who testified she knew what Petitioner did was wrong but asked the court to be merciful in sentencing. (Ex. E, 40).

Petitioner testified next. Co-counsel Teresa Sopp conducted the questioning. Petitioner testified: "This is not me, this whole charade the past two years. I apologize for wasting your time, and I apologize to the families. And I exercised incredibly bad judgment."  Petitioner stated further: "And I just got – I have suffered through this and I just plead that you be merciful and give me a chance to live my life again and be a productive member of society."  Petitioner stated he was sorry to the victims and their families. He stated he loved the life he had but he had ruined it and it was his fault. Petitioner told the judge he had a job and place to live waiting for him when he was released from prison.  (Ex. E, 40-44).

On cross-examination, the following transpired:

Q.     Mr. Wright, you indicated that you're sorry to the victim. Isn't it true that you've been maintaining through the past nearly two years that there are no real victims in this case?

A.     Well, I'm just implying what has been implied to me by the Court and what's been implied by you. I – in one case [M.W.] has stated numerous times she was not a victim in this. I'm just going by what are the different proper particulars in the courtroom, since they're all new to me.

Q.     Yeah, but my question is that you actually write to people or say to people in jail calls there are no victims in this case?

A.     Like I said, that's just in the way it's been portrayed to me by the victim in this case, one of them, and like I just explained to Judge Soud, obviously a parent is writing letters and I guess there is a victim, and I apologize to them. I know that's the way it's been explained to me. Again, I messed up and I created the victim, and I'm sorry for that. That has never been my intention ever.

Q.     Okay. This is not me, this whole, did you say charade for the last two years?

A.     Combobulate (phonetics) would be a better word I think.

Q.     Well, what's happened in the last two years is you've been held accountable by the court system. Your criminal actions go back much further than two years; am I correct?

A.     Yes, I guess so, so, yes, so it's more than, yeah. I was apologizing to the Judge here for the combobulate in the last two years and what time I've wasted in the court and previous counsel and so to speak, stuff like that.

Q.     You actually started contact with the Hilliard victim, also known as H.W., in about April of 2010.

A.     That was, like I said, I don't really know off the top of my head, but every student from my class for those years had contact information for me because they were out and about on the school grounds, and if they ever had to go to

the office or they had to contact me, I was never – it was never anything inappropriate. Nothing was ever presented that way.

Q.     Are you saying there was nothing inappropriate until H.W.?

A.     I'm saying that time frame that you're speaking of, as far as inappropriate behavior, is not accurate.

Q.     Okay. Well, it's not appropriate to have multiple texts and telephone calls with a 14 year old student.

A.     Well, there were male and female students who contacted me to check out equipment or if they needed to go somewhere else, because my classroom wasn't a conventional classroom. It wasn't like it was anything inappropriate. I had football players who were 14 years old contact me for a ride home.

Q.     Okay. Well, it was to the point where H.W.'s mother said the contact had to stop, correct?

A.     I was – I was never aware of that. Once again, that's –

Q.     H.W. told you that her mother said no more texting or calling?

A.     Okay. Well, then she was –

Q.     You don't recall that?

A.     If she was saying that, then she was the one who signed up for my class the second year I had it as well. I mean, if it was that big of an issue, I don't think her mother would approve that.

Q.     Now, as your contact with H.W. started in 2010, the last contact you had with H.W. outside the court process was after M.W. had been interviewed by the police and the police had told you they wanted to contact M.W.; am I correct?

A.     Yes.

Q.     Okay. And you did that to tell her that you never meant her any harm and you loved her?

A.      Yes.

Q.      Now, you've also said in the jail calls and letters that any photographs and any inappropriate photographs of former students would have been eight years ago or so and they would be 24 or 25 by now, correct?

A.      I mean, I'm just having – asking – going by the time line that was presented to me by my previous counsel, speaking off the cuff, so to speak.

(Ex. E, 39-49).  The judge asked Petitioner if he loved H.W. also, and Petitioner

responded:

A.      No, sir, and I've never – I never – there was never any type of relationship process with that. That's what I don't understand about the whole thing. It was presented to me, from a deposition I didn't authorize by my previous counsel, that when it was presented to me that there was a relationship, there was never any type of relationship. I mean, I left that school before any of this happened with her.

(Ex. E, 49).  Petitioner explained that of the 1,500 kids he has taught over the past

seven years, he has probably told 85% of them "much love or I love you or I lov ya,

something like that."  (Ex. E, 52). Questioning continued from the prosecutor:

Q.      Now, you have had the opportunity to review and been in court when the videos of you masturbating that you sent to H.W. –

A.      Uh-huh.

Q.      – were played, correct?

A.      Yes.

Q.      Okay. And you would agree with me that it is not an appropriate relation to say, I want to stick my dick in you?

A.      Not at all at that point, no.

Q.      Okay.

A.      A bad judgment on my part.

(Ex. E, 52-53).

Q.      Now, you have approximately 63 videos of you masturbating on your phone?

A.      I don't know. Like I said, I don't know. It was deleted, so I don't.

Q.      Okay. Did you tell Dr. Neidigh this, that you like to videotape yourself masturbating and send it to at least one underage girl?

A.      I made Dr. Neidigh aware of all my charges and everything when he asked me, yes.

Q.      Now, did you tell Dr. Neidigh the truth about your sexual relationship with M.W.?

A.      I provided him with everything that I was supposed to at the time, as far as the relationship, yes.

Q.      So you told him the truth?

A.      I thought I did. Like I said, it's been a year. I don't remember what I told the guy specifically, but I told him the truth. I told him exactly my thoughts on everything. I answered 500 questions. I went through countless photographs of underage kids to see if I have any type of – it was disgusting to look at two year old kids and see if I had any type of sexual inclination towards it, it was humiliating, but somehow it was borne out by the process. I passed.

Q.      Okay. Now, isn't it true that you told Dr. Neidigh that there had only been two incidents with M.W. before her 18th birthday and neither involved any type of sexual intercourse?

A.      I – I – like I said, I don't recall, but, yes, if you're saying it, if it's on the paper, then I guess that's what I said.

Q.      Okay. And that is not true?

A.     No, at the time it was not.

Q.     Well, at this time, having pled guilty to three counts of sexual battery, it is not true that you never had sexual intercourse with M.W. prior to her 18th birthday?

A.     Are you asking me if I did or did not, was it not true? Like I said, I pled to it, so I – I – yes, and I have apologized for at least two different times.

Q.     Which you did not tell Dr. Neidigh. Would you like to review your psychosexual from Dr. Neidigh?

A.     No, ma'am. I'm just – I'm just telling you what I have, it's I was going off of what my previous counsel told me to do in that situation.

Q.     So your previous counsel told you to lie to Dr. Neidigh?

A.     He didn't tell me to lie. He just told me stay with what I've already stated, and that's what I was going by.

Q.     You also denied to Dr. Neidigh having any type of sexual contact with any other student; am I correct?

A.     Yes, ma'am.

Q.     Okay. And you told him that one of your students sent you nude photos and some graphic photos of her and her boyfriend?

A.     Uh-huh.

Q.     That these photos were unsolicited?

A.     Yes.

Q.     Okay. So you did not mention to Dr. Neidigh your videos saying, you want a video, here's a video for you, H.W.?

A.     No, I did not. It was a little embarrassing.

(Reporter asking for clarification.)

A.      I said it's a little embarrassing and I apologize that I didn't mention it at the time, that I felt that he knew my charges and he was sitting there looking at my charges.

Q.      So you lied to him and expected him to figure it out?

A.      I didn't, I didn't lie to him about that. I didn't tell him. He didn't ask if there was.

(Ex. E, 52-56).

Q.      Now, when you were released from jail, you were instructed not to have any contact with M.W.; am I correct?

A.      Yes, ma'am.

Q.      And you violated that?

A.      I did.

Q.      And then when you were placed back in jail you were again told not to have any contact with M.W.?

A.      Yes, ma'am.

Q.      And you violated that?

A.      I did.

Q.      Repeatedly?

A.      Yes, ma'am.

Q.      And you wrote letters?

A.      I wrote one letter.

Q.      You wrote multiple letters and provided them to your mother to give to M.W.?

A.      Yes, ma'am. I found – I also write my children and feel that's just kind of a way of decompressing, even if they're not going to get read, I feel that writing, considering it somebody's way of decompressing, and when you're sitting in solitary confinement, you've got to find stuff to do.

Q.      You wrote approximately seven letters to M.W. and asked your mother to deliver them and so you mailed them to your mother?

A.      Yes, ma'am. My mom did –

Q.      You asked – you also asked your mother to purchase Christmas gifts for M.W.?

A.      I did.

Q.      You told her specifically what to buy for M.W.?

A.      With the hopes I was getting out, yes, ma'am, I did.

Q.      You provided information to other inmates to call, text or deliver a letter to M.W. once you were on phone restrictions?

A.      The one time, yes, I did.

Q.      Okay. Well, there was two different inmates that were –

A.      There was one was a letter and one text message.
Q.      Okay.

A.      Two different ones, one and one.

(Ex. E, 62-64).

Q.      Do you recall what you were on the web doing on June 16th of 2014 prior to turning yourself in to the police?

A.      I have no clue. On the internet?

Q.      Uh-huh.

A.      I have no clue.

Q.      Looking at porn?

A.      I, like I said, I have no clue.

Q.      Young nubile porn?

A.      Are you talking about my home computer or are you talking about – I don't know. June 16th, I don't have a clue what I was doing.

Q.      So it's possible?

A.      I don't – I'm – I'm sure you're going to show me something that says it is. I don't know. You asked me and I said I don't know.

(Ex. E, 65-66).

On redirect, Petitioner apologized for violating the court's no-contact order. (Ex. E, 68). Petitioner testified that it was not until he retained Mr. O'Mara and Ms. Sopp that he was explained the status of the law in relation to his actions and he came to understand why his behavior resulted in criminal charges and it was then he made the decision to plead guilty. (Ex. E, 71).

The judge then asked Petitioner the following questions:

Q.      What led you at that point? As I sit here and listen to the testimony throughout the day, as I look at your mom in the eye, and the anguish on her face is readily abundant.

A.      Yes, sir.

Q.      And I listen to your testimony, I listen to the letters that are written on your behalf, I presided over prior hearings where videos have been played and other testimony of an abhorrent nature has been received, you today express lapse of judgment, terrible decision, would never do that again, I'm terribly sorry, what leads a man to get to that point where his judgment is so infirm –

A.      Right.

Q.      – that he does the things that you have pled guilty of doing? What led you to that point?

A.      I was not happy in my marriage at the time and I was – throughout the whole period of it. Like I said, I was like to the point, yes, I guess I did have a problem with alcohol that I didn't recognize, that I didn't really think that I did because I was still able to function and go to work and do everything else, I just, I honestly I had really bad judgment in this.

Q.      All right. So unrest, unrest in the marital relationship, potentially a previous unperceived problem and addiction to alcohol. And you said today you're 34, I believe; is that right?

A.      Yes, sir.

Q.      So then in 2010 you would have been approximately 28?

A.      Yes, sir.

Q.      And when your contact with M.W. began, how old were you?

A.      With M.W., I was 31.

Q.      Okay. So is it simply unrest in the home and problems with alcohol that led you to that point, or did you have other addictions and problems?

A.      No, sir. I had no other addictions or problems.

Q.      Were you addicted to pornography?

A.      No, sir, I was not. When the thing opened up with M.W. and everything
        happened with that, I was at that point looking at I was trying to get out of
        teaching. I was just trying to get my degree and go back toward marketing and
        do what I did before, in case we weren't able to continue our relationship that
        me and her discussed.

Q.      So as you sit here today, you do not believe at any point in the past or now
        you have suffered a problem or addiction to pornography?

A.      I honestly don't know, sir, I do not.

(Ex. E, 71-74).

    Petitioner testified he had not solicited the first video that H.W. sent him of her

having sex with her boyfriend. (Ex. E, 74-75). He now recognizes that his response

to the video was inappropriate. (Ex. E, 75). He testified he is willing to participate in

counseling or treatment options to address this behavior. (Ex. E, 75-76).

    Following the presentation of testimony, the court reviewed the presentence

investigation report (PSI). (Ex. E, 77-78). The court then entertained argument from

counsel.  The prosecutor argued that Petitioner was a danger to the community in two

ways: (1) he engages in sexual activity with minors, particularly minors who are

entrusted to his care as a teacher; (2) he does not believe that the laws apply to him.

The prosecutor argued that Petitioner was less than candid with Dr. Neidigh. The

prosecutor argued that at no point had Petitioner acknowledged he had broken

statutory and moral laws. "That's of concern. That is someone who, in their core,

doesn't know that it's wrong to engage in sending masturbatory videos to a student,

beginning at the age of 14." The prosecutor argued that while Petitioner wants out of trouble, there had been no assurances from him as to how he will avoid violating all moral and statutory laws and avoid violating the public trust. The prosecutor pointed out that Petitioner continued to violate court orders until he was shut down. Referring to the PSI, the prosecutor argued that M.W. suffered damage in that she lost her Bright Futures Scholarship and struggles in college and has had to have counseling. The prosecutor stated that M.W.'s parents had requested a sentence of 20 years. In closing, the prosecutor concluded: "It's what is justice, and justice for the victims and justice for the community is to punish the defendant for his deliberate ongoing, longstanding abuse of his position of trust and sentence him to the 20 years in prison, followed by sex offender treatment, for the treatment that he obviously needs." (Ex. E, 78-82).

Mr. O'Mara began his argument by noting he had only been on the case for a few months. He stated that good defense attorneys are sort of like doctors, they look at a case and can see the fever level and can literally cut into the arm and know what to do immediately. O'Mara stated he knew what to do immediately with Petitioner's case. O'Mara stated he did not wish to throw former counsel under the bus but "this case was litigated in a way that was completely ignorant of the justice that criminal defense attorneys are supposed to do." O'Mara stated that this case should have been

handled in a way that acknowledged Petitioner's responsibility, not just by him, but "by the person who is tasked with the responsibility of doing it on his behalf." O'Mara presented the analogy that a patient does not heal himself, but rather the doctor heals the patient, and the patient is told to act a certain way to help their healing and has to listen to what the doctor says. O'Mara opined that the prior counsel in this case got ready for an aggressive presentation before juries that he had to lose. There was no winning this case at all. Petitioner was going to get convicted of most of what he was charged with and he was going to be exposed to decades and decades and decades in prison, still is, but he would have, and there was no awareness, no understanding, no actions taken to avoid any of that.  O'Mara stated that as soon as he got on the case he contacted the prosecutor "not to avoid justice, but to actually get it, to figure out a way to acknowledge the responsibility of what he did to his victims and how he's going to pay a proper price, not what he's looking at when some jury says, no, you can't do that to your students." (Ex. E, 83-87).  O'Mara argued further:

> The Daniel Wright that I know has acted properly. We know he's acted properly for the past year because I guess at some point he woke up and realized that this really isn't the non-event that he was advised that he carried with him. You don't do what he did with his students unless you carry an extraordinary level of immaturity, lack of self-awareness, whether it's too much alcohol or too much pornography or too much entitlement when he was growing up or whatever combination of that, he thought it was okay to bend the rules however he wanted to do, but how he got himself in the position to allow this thing to get completely off

the rails was because nobody gave him the education or the advice that we are supposed to do as good lawyers to say, not only can you not do this, but you have to fix it quickly. We're here in a case, and I'm not minimizing what happened, I know what he pled to, I pled him to it, I was there when he pled to it, so I'm not minimizing it, but I think in your history, I believe in Ms. Thurson's history and I know in my history that if this matter was handled properly from the beginning, he's never denied what he's did [sic], and all clients will minimize to a certain extent, but no denial of what he did, if this matter was handled in the way it should have been handled before, I don't believe any of us would be looking at the length of sentence, the potential range of sentencing that he's looking at, and I have to go into a little bit of the reasons why. Ms. Thurson spent some time going back over the facts of the case that we tend to minimize at least in the sentencing, but we do have a technical violation of the statute with a 17 year old, mature, willing, in her own words, aggressive person involved in the sexual relationship. She said that she was the one that instigated, was her words. That doesn't make it a non-crime, but we, as defense attorneys, look at that and know that it minimizes the culpability along a spectrum that has a lot of grays in it, certainly still within the criminal range, but a lot of grays.

And we have the other victim where there was no sexual contact, and affirmatively as the discovery I think was presented both in previous hearings but also through the testimony of the investigating officer today, in this world that Daniel Wright allowed himself to live in of having any contact with children, students that he shouldn't have had, that he told that victim that there will be no contact. Again, a weird thing for a lawyer to get up here and say, but in the spectrum that we all have to live in when we decide on sentences, I think that those considerations should be considered by the Court, and I think that had they been properly considered by the defense attorney a year and a half ago that we would never have gotten to the point where it festered so horribly that we are now looking at the sentence range that we're looking at.

(Ex. E, 87-90).  Mr. O'Mara argued that a sentence of 10 years was appropriate. (Ex.

E, 93-94).  Addressing the prosecutor's argument that Petitioner was a danger to the

community, O'Mara argued:

> So what the State said is that he is now an ongoing danger to the community. The psychosexual evaluation doesn't support that. His behavior before, in that he has no prior criminal record, doesn't support that. His behavior in the past year, though not before that, his behavior in the past year doesn't support that he's an ongoing danger to the community, so I don't think that that's a proper consideration for you to worry about. At the very least, he has an extraordinary amount of time to be incarcerated, that, in and of itself, does serve the purpose of protecting the community, to a certain extent. We all know what sentence he was there for. It's a deterrent effect. I believe that any teacher who looks at this sentence, and they all will and should, will have a deterrent effect because of the sentence that you're going to give him, at the low end of what you do.
>
> Punishment is another reason for our criminal sentencing, and a 10 year sentence, were you to consider that, is significant punishment, not only is it a third of his life, it is a decade of his productive life, it is a decade within which a suffering he's already undertaken, he's simply not going to see his children, not going to have that. We know that that's of his own doing, but that is also punishment that I think this Court should consider.

(Ex. E, 94-96).

In rebuttal, the prosecutor uttered the remarks now challenged by Petitioner:

> The problem for Mr. Wright is that Mr. O'Mara won't be on his shoulder telling him how to behave for the rest of his life. Mr. O'Mara indicated to the Court that he knows how the defendant should behave. I submit to the Court that the defendant did not give any evidence to the Court today that he knew and accepted

what he had done before was wrong. In his psychological [sic] he does not accept.

I take issue with Mr. O'Mara's representation to the Court that it's all his, you know, the denial or minimizing is due to just, you know, that's what people do. The defendant denied to the police that he had any interaction with H.W. He minimized to the point of saying he had no criminal actions with M.W. and denied any actions and criminal actions with M.W.

No internet photographs, no internet behavior, no inappropriate anything with H.W., and that's not on defense, prior defense counsel, that's on defendant. He lied. He lied to Dr. Neidigh, who was brought in to assist him, and although Dr. Neidigh's initial report was February 2015, the update is January of 2016.

And I'm sure that the Court is aware of this, but I would be remiss if I didn't mention that the psychological definition of pedophile is different than the criminal one. Psychologically, because the victims were postpubescent, he's not a pedophile, but that's not our legal definition. Our legal definition is these victims were minors. He was in a custodial position. With H.W., she was 14, 15, 16. And so criminally and in our society he is a pedophile. Defense counsel argues that we need to deter and punish, and that's what I'm asking the Court to do. As far as help Daniel, Daniel needs to help himself, which he has not done, and to argue to the Court that he's learned his lesson because he hasn't gotten in any trouble in almost a year in the jail, well, his thing is minor girls.

Because Daniel has not helped himself, not given any indication, through today, that he really has insight into what he's done wrong and why it's wrong, there are no assurances that he won't go right back and do the same behavior when he's released from prison.

(Ex. E, 101-103)(emphasis added).

Defense counsel did not object to the prosecutor's statements in rebuttal. (Ex. E, 103).

The court then orally imposed the sentence. The oral pronouncement is lengthy, taking up some seventeen pages of the transcript. (Ex. E, 104-121). In those seventeen pages, in discussing the crimes involving H.W., the court made the following statements now challenged by Petitioner:

> [B]ut the reality of an additional case involving an additional student, who is substantially younger than M.W., at 14, 15 and on years of age, involving the Hilliard victim, and what must be considered by the Court because now there is no longer an isolated occurrence, but now there is a pattern that persists. It is a pattern born of utter depravity.

(Ex. E, 113).

Petitioner argues in Ground One that had the prosecutor's material factual misrepresentation regarding H.W.'s age been corrected by defense counsel, then the sentencing judge would likely have considered more seriously the evaluations of the two psychologists rather than dismissing them. Petitioner argues that had the court not believed that he sent the nude videos to a 14 year old, the psychologists' reports would likely have influenced its opinion regarding the fact that he is not a pedophile and not a future danger, and therefore would have influenced the decision as to what sentence was appropriate.  However, the evidence adduced at the <u>Williams</u> rule

hearing was that Petitioner and H.W. began texting when H.W. was 14 years old. As argued by the prosecutor at the <u>Williams</u> rule hearing, it was at this tender age that Petitioner began grooming H.W. to eventually accept his sexual videos and in return to send him explicit photos and videos of her. While he may not have sent or solicited sexually explicit videos until she was 17 years old, he is in no way less of a danger to the community as he has corrupted not one, but two, minor victims in his criminal endeavors.  As found by the postconviction court, to the extent the prosecutor may have misspoken as to the relevant age of H.W. when the sexual content began to be transmitted, there is no question H.W. was a minor when Petitioner ultimately did send the sexual content and, thus, to whatever extent the prosecutor's comment was somewhat misleading no prejudice resulted therefrom. At the <u>Williams</u> hearing, the three masturbatory videos were played, including Petitioner's sexually explicit language directed to H.W. when she was a minor. As fully explained by the postconviction court, whether H.W. was 14 or 17 when the sexual content began being transmitted did not have any bearing on the sentencing court's decision to impose a sentence of 20 years. While Dr. Neidigh may have opined that Petitioner did not have any sexual interest in prepubescent teens or children, that he is not a pedophile, that he presented no significant risk indicators for child molestation or sexual assault, and that he is a low risk to the community and is not in need of sex

offender registration to ensure community safety, his opinion was not based on the complete true picture. Petitioner admittedly lied to and misled Dr. Neidigh about at least three matters. First, he told Dr. Neidigh there had been no sexual activity with M.W. prior to her 18th birthday when in fact there had been. Second, he told Dr. Neidigh that the sexual videos and photos sent by H.W. were unsolicited when they were. Third, he did not even tell Dr. Neidigh he had sent sexual videos of himself masturbating to H.W.

Petitioner accepted the factual basis read into the record at the plea hearing, including that he had engaged in actual sexual battery with M.W. when she was a minor, that between August 18, 2011, and August 17, 2013, he knowingly transmitted videos of himself masturbating to H.W., and that between October 1, 2012, through June 16, 2014, he possessed videos containing sexual content involving H.W. Petitioner groomed and ultimately convinced two minor victims that he was in love with them so that he could violate them sexually. He repeatedly violated court orders prohibiting him from contacting them, reaching out to them in any way possible to ensure them he still loved them, specifically telling M.W. he wanted to marry her and directing her how to permanently delete all cell phone and computer evidence of their indecent relationship. Dr. Neidigh had no knowledge of the extent of Petitioner's actions in this regard.

As found by the postconviction court, to any extent the prosecutor's now challenged remarks interjected some ambiguity as to H.W.'s exact age at the precise time the sexual videos were exchanged, and to any extent Mr. O'Mara and Ms. Sopp should have objected to or corrected these remarks, no <u>Strickland</u> prejudice resulted therefrom. The postconviction court stated there was no question H.W. was a minor at the time the sexually explicit videos were exchanged. The precise question of whether Petitioner is a pedophile in the sense that he has, and will in the future, be a threat to prepubescent children was clearly not a primary factor in the sentencing judge's decision to impose a sentence of the agreed-upon cap of 20 years. Petitioner has not demonstrated, as is required under 28 U.S.C. § 2254(d), that the state court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts in light of the evidence in the state court record. Ground One should be denied.

**GROUND TWO: "THE PROSECUTOR KNOWINGLY PRESENTED FALSE ARGUMENT ON A MATERIAL FACT TO THE STATE TRIAL COURT DURING THE SENTENCING HEARING."**

PETITIONER'S CLAIM

Citing Gilgio v. United States, 405 U.S. 150 (1972), Petitioner alleges that the prosecutor knowingly presented false argument on a material fact to the state trial court during the sentencing hearing resulting in the violation of his constitutional due process rights. Petitioner is referring to the statement of the prosecutor at the sentencing hearing referenced in Ground One regarding the age of H.W. during the time frame when he sent her videos of himself masturbating. Petitioner alleges that the record unequivocally establishes the age of H.W. when Petitioner sent these videos, and when she sent him photographs and videos of herself, and therefore the inaccuracy of the prosecutor's statement at sentencing is clear as the videos were not sent by Petitioner when H.W. was 14 years old in the eighth grade. Petitioner alleges that the prosecutor's representation that H.W. was 14 was known to be false by the prosecutor and tainted the sentencing proceedings resulting in prejudice to Petitioner. Petitioner alleges that the state courts' rulings on this claim were contrary to and an unreasonable application of Giglio and his Fourteenth Amendment rights, and were based on an unreasonable determination of the facts in light of the evidence contained in the state court record.

A. <u>EXHAUSTION OF STATE REMEDIES</u>

Petitioner raised this claim as Ground Two of his postconviction motion (Ex. T, 64-70), and he appealed the denial of this claim. (Ex. U).

B. <u>ARGUMENT</u>

In his postconviction motion, Petitioner alleged in Ground Two the same <u>Giglio</u> claim he raises in Ground Two of his federal habeas petition. The <u>Giglio</u> claim involves the testimony of victim H.W. elicited at the <u>Williams</u> rule hearing and the prosecutor's subsequent representation of H.W.'s testimony at the sentencing hearing.

The postconviction court summarily denied this claim as procedurally barred and as without merit. The order is quoted in full under Ground One of this answer as the claims are interrelated. As a threshold matter, the court found that the claim alleged at most that the prosecutor made an improper remark, not that false testimony was presented. The court then ruled that claims of improper prosecutor remarks are not cognizable in a motion for postconviction relief. As found by the court, Petitioner's claim is one of prosecutorial misconduct in misrepresenting a fact, not in presenting false evidence and failing to correct it in violation of <u>Gilgio</u>. As Petitioner concedes, no false evidence was presented. M.W. testified at the <u>Williams</u> rule hearing as to what her age was at the time she received and transmitted the sexually explicit messages, photos, and videos. Petitioner's claim that the prosecutor committed

misconduct by subsequently misrepresenting this testimony to the court should have been raised on direct appeal.  See, e.g., Smith v. Sec'y, Dep't of Corr., Case No. 8:13-cv-2260-T-36AEP, 2020 WL 1451680, at *35-36 (M.D. Fla. Mar. 25, 2020)(finding that federal habeas petitioner's claim was not that prosecutor presented false testimony but that prosecutor misled the jury, and that such a claim constituted a substantive claim of prosecutorial misconduct that should have been raised on appeal and was procedurally barred from consideration in a postconviction motion); Solomon v. Sec'y, Fla. Dep't of Corr., Case No. 3:17-cv-264-J-32JRK, 2020 WL 377063, at *20 (M.D. Fla. Jan. 23, 2020); Allen v. Tucker, Case No. 5:09cv287/MCR/CJK, 2012 WL 3764502, at *30 (N.D. Fla. June 8, 2012)("Petitioner's claim, whether construed as one of false testimony, false evidence, manufactured evidence and evidence tampering, or as one involving Brady/Giglio violations and prosecutorial misconduct, is procedurally barred from federal habeas review, because petitioner failed to raise the claim(s) on direct appeal and was procedurally barred from raising them in his postconviction motion.").

In Florida, a motion for postconviction relief cannot be based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence. Fla. R. Crim. P. 3.850(c). Thus, Florida law bars claims in a postconviction proceeding that could have been raised on direct appeal. See Philmore v. McNeil, 575 F.3d 1251, 1264 (11th Cir. 2009); Smith v. State, 453

So. 2d 388, 389 (Fla. 1984).  A Florida court's per curiam affirmance of a trial court's ruling explicitly based on procedural default "is a clear and express statement of its reliance on an independent and adequate state ground which bars consideration by the federal courts." Harmon v. Barton, 894 F.2d 1268, 1273 (11th Cir. 1990). Petitioner's failure to properly raise this claim in the state court proceedings resulted in the application of a procedural bar by the state courts and, thus, the claim is likewise procedurally barred from review in this Court. The state court's imposition of Florida's procedural bar in denying Ground Two is adequate to support its judgment. See LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1260 (11th Cir. 2005)(holding that because habeas petitioner did not raise his claim on direct appeal, the postconviction court's refusal to consider the claim because it was procedurally barred rested on an independent and adequate state ground that precludes federal habeas consideration of the issue).

Lastly, the court found that even if Petitioner's claim was cognizable in a postconviction motion, it was without merit. As with Ground One, the court found counsel was not deficient and, even if deficient, no prejudice resulted. To the extent the postconviction court considered the merits of Ground Two, Respondents rely on the arguments presented under Ground One, *supra*. The state court's rejection of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an

unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground Two should be denied.

> **GROUND THREE: "THE STATE TRIAL COURT ERRED IN REFUSING TO CONSIDER MITIGATION DURING THE SENTENCING HEARING. ALTERNATIVELY, DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO CHALLENGE THE STATE TRIAL COURT'S PERCEPTION THAT IT COULD NOT CONSIDER THE MITIGATION PRESENTED DURING THE SENTENCING HEARING DUE TO THE BELOW-GUIDELINES PLEA RANGE."**

<u>PETITIONER'S CLAIM</u>

Petitioner alleges that in his direct appeal from his judgment and sentence he argued that the trial court erred in refusing to consider mitigation during the sentencing hearing because a sentencing range had been established by a negotiated plea, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He alleges that in his subsequent postconviction motion he claimed that defense counsel was ineffective by failing to challenge the trial court's perception that it could not consider the mitigation presented at the hearing due to the below-guidelines plea range. Petitioner alleges that the trial court considered the mitigation evidence presented but essentially excluded it believing it was prohibited from factoring it into the sentencing decision. Petitioner alleges it was

a violation of his constitutional rights for the trial court to refuse to take into account the mitigating evidence presented, and that had counsel properly objected and presented relevant legal argument to the court (i.e., that the plea agreement did not preclude the court from considering mitigation and, in fact, the trial court was required by law to consider the mitigation presented), there is a reasonable probability that the argument would have prompted the court to change course and fully consider mitigation and to impose a sentence of less than the absolute maximum it imposed. Petitioner asserts that the state court's rejection of this claim was contrary to and an unreasonable application of (1) his constitutional due process rights and (2) Strickland and his right to the effective assistance of counsel. Petitioner also asserts that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence contained in the state court record.

A.   EXHAUSTION OF STATE REMEDIES

Petitioner raised this claim of trial court error on direct appeal. (Ex. L). He also raised the claim of ineffective assistance of counsel as Ground Three of his postconviction motion (Ex. T, 70-80) and appealed the denial of this claim. (Ex. U).

B. <u>ARGUMENT</u>

Petitioner raises two distinct claims under Ground Three of his federal habeas petition. First, he asserts trial court error as he did on direct appeal from his judgment and sentence. Second, he asserts ineffective assistance of counsel as he did in Ground Three of his postconviction motion. Respondents address the claims separately as follows.

<u>Direct Appeal Claim</u>

Petitioner raised one claim of error in his direct appeal, arguing that the trial court erred in refusing to consider mitigation evidence offered at the sentencing hearing. He argued that if he was denied relief under this claim, his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution as well as corresponding provisions of the Florida Constitution would be violated. Petitioner argued that defense counsel adequately preserved the issue for review and that even if the error was not preserved it must be corrected by the court because it is fundamental in nature as a denial of due process under <u>Branton v. State</u>, 187 So. 3d 382 (Fla. 5th DCA 2016). (Ex. L).

Petitioner pled to 38 total felonies: 3 counts of sexual battery, 31 counts of possession of child pornography, 3 counts of transmission of harmful material to a child, and 1 count of tampering with evidence. His guidelines scoresheet ranged from 58.29 years in prison to life. (Ex. A, 398). The agreed-to negotiated plea deal called

for a sentencing range of 10-20 years which constituted a downward departure from the guidelines. As correctly argued by the State in its answer brief, Petitioner's claim of sentencing error was not preserved for review. (Ex. M, 6-7). To preserve the precise claim raised, trial counsel had to make a specific objection contemporaneous to the asserted error at sentencing. As recognized by Petitioner, trial counsel never raised an objection that the court erred by refusing to consider mitigation. Thus, the 1st DCA reviewed the issue for fundamental error. On the merits, as argued by the State, the record reflects that the court was aware mitigation evidence could be considered and did take the evidence into account in reaching its decision. At sentencing, the court addressed the evidence in support of mitigation:

> And then **I have to consider the mitigating factors, argued well by counsel**. The mitigating factors of one of the students being a willing participant. Her preference of no further punishment, that you've suffered enough, that this was not something was inflicted on her against her will, **all of that was certainly considered**, and the reports form the psychiatrist and psychologists, rather, and Dr. Neidigh and Dr. Drew and the supplements thereto and the polygraph examination, **all of those have been looked at and considered by the Court.** (R. IX, 113).

(Ex. L, 8; Ex. E, 113)(emphasis added).

The court also made it clear it reviewed the PSI, witness testimony, and letters in support of Petitioner. (Ex. E, 111-114). Contrary to Petitioner's argument, the trial court's ruling demonstrates it did consider and take into account the Petitioner's mitigation when deciding the sentence.

Petitioner cites the following statement from the court in support of his argument:

> So the Florida Legislature has spoken very clearly, and this court is duty bound by its oath to follow the declarations of the Florida Legislature as enacted by its laws. And **considering and balancing the mitigation, of what effect is that mitigation in light of the factors that the plea agreement already contemplates the sentence**, the maximum of which is approximately one third of the minimum exposure of the sentencing guideline.

(Ex. E, 115-116)(emphasis added). Petitioner argues this statement reflects the court thought it was required to ignore mitigation. However it does just the opposite, the trial court stated that it *balanced and considered* the mitigation in light of the circumstances of the plea agreement. The ruling reflects that after considering the mitigation evidence presented, the trial court chose to give little weight to the evidence given that Petitioner was already receiving a 38-year downward departure. Thus, the court was not refusing to consider the mitigating evidence; rather it chose not to weigh the mitigation heavily in light of the considerable downward departure sentence. The court weighed the mitigation, and in light of the circumstances found the maximum sentence within the plea bargain's range to be appropriate.

Given the weakness of the mitigation evidence, the court gave the evidence little weight. The defense presented Dr. Neidigh's psychosexual evaluation but Petitioner admitted at sentencing he lied to Dr. Neidigh. As argued by the prosecutor at sentencing, Petitioner lying about having sex with an underage girl undermines

whatever opinion the doctor provided. Additionally, the defense called Major Johnson who testified on cross-examination that Petitioner violated the court's no-contact order causing the jail to have to keep Petitioner in isolation and eliminate his phone privileges just to get him to comply with the order. (Ex. E, 29). The defense argued that M.W.'s wish for minimal punishment was evidence of mitigation, but it could also be seen as evidence of the extent to which Petitioner's manipulation affected her.

Petitioner relies, as he did in the direct appeal, on the decision of the Fifth District Court of Appeal (5th DCA) in Branton v. State, 187 So. 3d 382 (Fla. 5th DCA 2016). In Branton, the defendant was brought back for resentencing after the State conceded that it was error to impose a minimum mandatory sentence. During resentencing, the court told the defendant "we're not here for mitigation of your original sentence," and it was not proper to take his mitigation into account at a resentence. Id. at 383. On appeal, the defendant argued it was not proper for the court not to consider any of his postconviction rehabilitation evidence at resentencing. The 5th DCA agreed and found error because "resentencing proceedings must be a 'clean state,' meaning that the defendant's vacated sentence becomes a 'nullity' and his resentencing should proceed de novo on all issues bearing on the proper sentence." Id. at 385, citing Galindez v. State, 955 So. 2d 517, 525 (Fla. 2007). Thus the 5th DCA found the trial

court applied the wrong standard on resentencing, negating the defendant's ability to present any meaningful evidence prior to being resentenced, violating his right to due process.  In concluding that the defendant was entitled to a new sentencing hearing, the 5th DCA expressly stated "[i]n doing so, we emphasize that our holding in this case is narrow." Id.

In Petitioner's case,  nothing in the sentencing court's ruling indicated it believed it could not consider mitigating factors in sentencing Petitioner. In fact the court stated that "I have to consider the mitigating factors, argued well by counsel." (Ex. E,113). Notably, in a footnote in Branton, the 5th DCA noted that if the trial court had announced it weighed and considered the testimony from both the defendant and the victim and concluded that a 40-year sentence remained the appropriate sentence, then the issue presented by the defendant would be meritless. Id. at n.2. This is exactly what the trial court did in Petitioner's case when it stated that it had considered and balanced the mitigating factors in coming to its decision.  The circumstances of the instant case are entirely different than Branton. The court's narrow holding in Branton dealt with the court's misapplication of law as it pertained to a resentencing, whereas in the instant case the court was sentencing Petitioner based on a negotiated plea which constituted a departure from the guidelines. Unlike Branton, the trial court

herein never applied the wrong standard in sentencing Petitioner and never negated the defense's ability to present mitigation evidence. Thus, <u>Branton</u> is not applicable.

In the instant case, the trial court did not err, much less constitutionally err, in sentencing Petitioner. The court imposed a sentence within the range of the negotiated plea deal after a sentencing hearing in which it heard and considered Petitioner's evidence in mitigation. The court did not refuse to consider the mitigating factors; rather it just chose not to give them great weight in light of the significant downward departure Petitioner received. The 1st DCA's rejection of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Postconviction Claim

In Ground Three of his postconviction motion, Petitioner presented the same claim of ineffective assistance of counsel he raises as Ground Three of his federal habeas petition. (Ex. T, 70-80). The postconviction court, after citing the controlling <u>Strickland</u> standard, summarily denied the claim as follows:

## GROUND THREE

In Ground Three of his motion, Defendant argues that his trial counsel was ineffective because he failed to correct the sentencing court's alleged belief that it could not consider mitigation evidence since Defendant had already received a negotiated sentencing range below his scoresheet guidelines.

Under Florida's sentencing guidelines, Defendant faced a minimum sentence of 58.29 years and a maximum sentence of life in prison. (Ex. F at 6; Ex. I.) However, under his negotiated plea, Defendant would receive only ten to twenty years in prison. (Ex. A.) Prior to pronouncing sentence, the sentencing court stated that the court had no desire to "send a message." (Ex. D at 109.) The sentencing court said that it considered victim [M.W.'s] proffer (Ex. D at 110-11 ), the "large number" of "well respected members of this community" who attended the sentencing hearing in support of Defendant (Ex. D at 111 ), and the letters offered in support of Defendant. (Ex. D at 112.) The sentencing court stated that it had to "consider the mitigating factors," which were "argued well by counsel." (Ex. D at 113.) These factors included [M.W.'s] status as a willing sexual participant with Defendant and the reports of Dr. Neidigh and Dr. Drew, which concluded that Defendant is "not an ongoing danger to the community." (Ex. D at 114.) Having considered these factors, the sentencing court "conclude[d] on the facts and the evidence in this case that the mitigation offered by counsel has been factored in full in this plea agreement. . . ." (Ex. D at 116.) The court then sentenced Defendant to twenty years in prison. (Ex. D at 117; Ex. B.)

Defendant argues that the record shows the sentencing court did not consider mitigation evidence before imposing Defendant's sentence. Defendant maintains that his trial lawyer was ineffective for failing to object to the sentencing court's alleged disregard of mitigation evidence. This argument is meritless.

Contrary to what Defendant argues in the instant motion, the sentencing court did not refuse to consider Defendant's offered

mitigation evidence. The record cited above demonstrates that the sentencing court received and considered all the mitigation evidence Defendant presented. In weighing the mitigation evidence against Defendant's offenses, the sentencing court simply concluded that the mitigation evidence did not warrant a sentence at the lower end of Defendant's negotiated range. Trial courts enjoy "great discretion in determining the length of a sentence so long as it is within the statutory limits." Mora v. State, 964 So. 2d 881, 884 (Fla. 3d DCA 2007). Indeed, a sentencing court may ultimately assign no weight to mitigation evidence, so long as the court allows the defendant to present the evidence and the court considers it. See, e.g., Branton v. State, 187 So. 3d 382, 385 (Fla. 5th DCA 2016) ("The court has the discretion to reject the testimony presented at sentencing hearings."); Id. at n. 2 ("For example, in the instant case, if the court had announced that it had weighed and considered the testimony from both Branton and the victim and concluded that a forty-year prison sentence remained the appropriate sentence, the present petition would be denied as meritless.").

Because the sentencing court did not ignore Defendant's mitigation evidence as Defendant alleges, it follows *a fortiori* that Defendant's trial attorney had no basis to object in the manner Defendant now advocates. And because there was no legal basis for Defendant's trial attorney to object in the manner described by Defendant, it is axiomatic that Defendant's attorney did not perform deficiently. See Hitchcock, 991 So. 2d at 361 ("Counsel cannot be deemed ineffective for failing to make a meritless objection."). Accordingly, this Court denies Ground Three of Defendant's motion.

(Ex. T, 98-100)(emphasis in original). The 1st DCA affirmed per curiam without a

written opinion. (Ex. W).

Just as the 1st DCA rejected the direct appeal claim that the trial court erred by

failing to consider mitigating evidence, the postconviction court rejected the

argument couched in terms of ineffective assistance of counsel. The court found that trial counsel was not deficient for failing to raise a meritless claim or objection. The trial court imposed a sentence within the range of the negotiated plea deal after a sentencing hearing in which it heard and considered Petitioner's evidence in mitigation. The record refutes the claim that the trial court believed it could not factor mitigating evidence in imposing a sentence within the range of 10-20 years. Counsel did not perform deficiently by failing to object on the basis urged by Petitioner. Petitioner fails to demonstrate that the state court's adjudication of this claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence in the state court record. Ground Three should be denied.

**GROUND FOUR: "DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY NOT PRESENTING EXPERT TESTIMONY TO CHALLENGE THE <u>WILLIAMS</u> RULE EVIDENCE RELATING TO VICTIM H.W., OTHERWISE PETITIONER WRIGHT WOULD NOT HAVE ENTERED THIS PLEA BARGAIN RANGE WITH THE STATE AND/OR WOULD HAVE RECEIVED A LESSER SENTENCE."**

<u>PETITIONER'S CLAIM</u>

Petitioner alleges that his defense counsel was ineffective by failing to present expert testimony to challenge the <u>Williams</u> rule evidence relating to victim H.W.

Petitioner alleges that his attorneys hired an expert to evaluate the State's digital evidence against him, but did not follow through with assuring that the expert would conduct a thorough and competent evaluation by litigating his access to the complete and unredacted files in this case. Petitioner alleges that had his attorneys appropriately done so, there is a reasonable probability that the outcome of the sentencing hearing would have been more favorable. Petitioner alleges furthermore there is a reasonable probability that an efficient use of the digital forensic expert would have produced a different outcome at the <u>Williams</u> rule hearing, resulting in him electing not to enter the "draconian plea" in the first place. Petitioner asserts he was denied his right to make a knowing, intelligent, and voluntary decision regarding his plea in violation of the Fifth Amendment to the United States Constitution. Petitioner alleges that the state court's rejection of this claim was contrary to and an unreasonable application of <u>Strickland</u> and was based on an unreasonable determination of the facts in light of the evidence contained in the state court record.

## A.  <u>EXHAUSTION OF STATE REMEDIES</u>

Petitioner raised this claim as Ground Four of his postconviction motion. (Ex. T. 81-86) and appealed the denial of this claim. (Ex. U).

B.  <u>ARGUMENT</u>

In Ground Four of his postconviction motion, Petitioner alleged the same claim he raises in Ground Four of his federal habeas petition. (Ex. T, 81-86).  The trial court summarily denied this claim as follows:

<u>GROUND FOUR</u>

In Ground Four of his motion, Defendant argues that his trial attorney was ineffective because he failed to present a "digital forensics expert" at the July 8, 2015 <u>Williams</u> rule hearing. Defendant argues that if his trial attorney had done so, the expert could have undermined some aspects of the State's case against Defendant. Ultimately, Defendant alleges that if his trial attorney had presented such an expert during the <u>Williams</u> rule hearing, Defendant would have rejected the State's plea offer and gone to trial or at least would have received a lesser sentence. Defendant's claim is without merit.

At the outset, this Court notes that failing to retain an expert witness does not *ipso facto* render an attorney deficient. <u>See</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 111 (2011) ("<u>Strickland</u> does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense."). Moreover, "a defendant does not establish that his attorney performed deficiently in failing to retain a defense expert when defense counsel 'rigorously challenged the state's expert.'" <u>Johnson v. State</u>, 247 So. 3d 689,696 (Fla. 1st DCA 2018) (quoting <u>Crain v. State</u>, 78 So. 3d 1025, 1040 (Fla. 2011)).

Here, the record demonstrates that Defendant's attorney rigorously cross-examined the State's investigator during the <u>Williams</u> rule hearing. (Ex. E at 34-56.) Furthermore, Defendant's motion does not contend that the photographs and videos at issue were illegally obtained or altered. Thus, it is unclear to this Court what material benefit a hypothetical digital forensics expert could have provided to Defendant when there is no question that

Defendant committed the acts alleged in the State's charging information. Indeed, the speculative language Defendant employs in his motion demonstrates this very point. See Mot. at 38 ("Had said examination been conducted, the expert *could* have provided definitive testimony on numerous critical questions for the defense. . . . Further, the expert *could* have confirmed that numerous innocent videos and photos existed on Mr. Wright's phone stretching back well before any of the pornographic images, thus corroborating the defense position that no pornographic images had ever been sent/received between Mr. Wright and [H.W.] prior to Mr. Wright moving to Fernandina Beach and [H.W.] turning age 17.") (emphasis added); Mot. at 19 ("This exculpatory and mitigating information *could* have been used by defense counsel to have argued for a lesser sentence . . . .")(emphasis added). Postconviction relief cannot be based on such speculation. Maharaj v. State, 778 So. 2d 944, 951 (Fla. 2000). No hypothetical expert witness would be able to offset the central, uncontroverted facts of this case: Defendant sent videos of himself masturbating to [H.W.] while [H.W.] was a minor, Defendant received and saved numerous pictures and videos of [H.W.] engaging in sexual acts while [H.W.] was a minor, Defendant engaged in various sexual acts with [M.W.] while [M.W.] was a minor, and Defendant repeatedly attempted to contact the victims despite court orders to the contrary. (Ex. D; Ex. E; Ex. F; Ex. G; Ex. H.)

On these facts, it strains credulity to suggest that Defendant could have received an even slightly shorter sentence if only defense counsel would have produced a digital forensics expert at the Williams rule hearing. Furthermore, Defendant's argument that he would have rejected the State's plea offer is incredible on its face. As shown above, Defendant faced a sentencing exposure of 58.29 years to life in these cases. (Ex. F at 6; Ex. I.) Defendant specifically acknowledged this fact when he entered his plea. (Ex. F at 8-9.)  Indeed, Defendant's attorney acknowledged on the record how dire Defendant's prospects were if he took his cases to trial. (Ex. D at 85-87.) Defendant's negotiated plea enabled him to lock in a sentencing range of ten to twenty years in prison, far below what he would have faced at trial. (Ex. A; Ex. I.) Defendant expressly acknowledged this fact when he entered his plea. (Ex. F

at 9-10.) Defendant received a sentence that comported with his sentencing agreement. (Ex. B.) The record demonstrates that failing to produce a digital forensics expert did not render counsel's performance deficient in this case. Furthermore, the record shows that, even if failing to produce such an expert had qualified as deficient performance, no prejudice could have resulted because Defendant would not have either received a lesser sentence or rejected the State's plea offer and taken his case to trial. See Hill v. Lockhart, 474 U.S. 52; 59 (1985). Accordingly, this Court denies Ground Four of Defendant's motion.

(Ex. T, 100-102)(emphasis in original).  The 1st DCA affirmed per curiam without a written opinion. (Ex.  W).

In short, the court found that counsel was not deficient as alleged and, even if counsel was deficient, no prejudice resulted.  The court also found the claim to be too speculative to state a basis for relief. The Williams rule hearing was conducted at a point when the parties intended on going to trial separately in the two cases for the purpose of determining whether testimony from H.W. could be introduced at the trial concerning victim M.W.   Respondents laid out in full under Ground One the testimony adduced at the Williams rule hearing. In Ground Four, Petitioner challenges the actions of Mr. Baker at the Williams rule hearing, claiming he would not have entered his plea, and/or that he would have received a more lenient sentence, had counsel not been deficient at that hearing. Petitioner alleges that having a defense expert examine the entirety of the digital files should have been an essential part of the pretrial preparation. Petitioner points out that on February 18, 2015, Mr. Baker

filed a motion to allow expert to examine Petitioner's cell phones. (Ex. A, 135-136). Also, on April 21, 2015, co-counsel Mr. Wilson filed a motion for additional discovery as to Counts 4-34 of 2014-CF-558, requesting the source or origin of each file, the method by which the file was obtained or downloaded, whether the file existed on more than one cell phone or computer, and the date the file was obtained by the State. (Ex. A, 171). Petitioner alleges that the defense expert never conducted a full review of the State's digital evidence due to defense counsel's failure to follow through and arrange for that examination to take place.

However, after the trial court ruled that the State would be permitted to introduce the other crime evidence regarding H.W. in the trial of victim M.W., Petitioner retained new counsel and negotiated a plea in both cases. As found by the postconviction court in denying Ground Four, Petitioner's claim as to what exculpatory information an expert digital forensics witness could or would have provided in the case was too speculative, conclusory and facially insufficient to survive a summary denial of the claim. In Florida, postconviction relief cannot be based on speculation or possibility. See Jones v. State, 845 So. 2d 55, 64 (Fla. 2003); Maharaj v. State, 778 So. 2d 944, 951-952 (Fla. 2000). Likewise, in federal habeas, conclusory allegations of ineffective assistance of counsel are insufficient to raise a constitutional issue. See Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir.

1991)(vague, conclusory, or speculative allegations cannot support an ineffective

assistance of counsel claim in federal habeas); Borden v. Allen, 646 F.3d 785, 829

(11th Cir. 2011)(Wilson, C.J., concurring in part and dissenting in part)(noting that

habeas claims may be dismissed at the pleading stage if they are so vague or

conclusory as to warrant dismissal for that reason alone, quoting Blackledge v.

Allison, 431 U.S. 63, 75 (1977)).

In Hill v. Lockhart, 474 U.S. 52 (1985), the Supreme Court explained the

application of the Strickland standard to claims of ineffective assistance of counsel

arising out of the plea process:

> In many guilty plea cases, the "prejudice" inquiry will closely
> resemble the inquiry engaged in by courts reviewing
> ineffective-assistance challenges to convictions obtained through
> a trial. For example, where the alleged error of counsel is a failure
> to investigate or discover potentially exculpatory evidence, the
> determination whether the error "prejudiced" the defendant by
> causing him to plead guilty rather than go to trial will depend on
> the likelihood that discovery of the evidence would have led
> counsel to change his recommendation as to the plea. This
> assessment, in turn, will depend in large part on a prediction
> whether the evidence likely would have changed the outcome of
> a trial.

Id. at 59.  As noted by the postconviction court in denying Ground Four, "Strickland

does not enact Newton's third law for the presentation of evidence, requiring for

every prosecution expert an equal and opposite expert from the defense. In many

instances cross-examination will be sufficient to expose defects in an expert's

presentation." <u>Harrington v. Richter</u>, 562 U.S. 86, 111 (2011). The Eleventh Circuit Court of Appeals has stated that "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." <u>Waters v. Thomas</u>, 46 F.3d 1506, 1512, 1514 (11th Cir. 1995). "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." <u>Bucklelew v. United States</u>, 575 F.2d 515, 521 (5th Cir. 1978).

The <u>Harrington</u> court stated that <u>Strickland</u>'s query into whether it is reasonably likely the result would have been different requires a showing that the likelihood of a different result must be substantial, not just conceivable. <u>Id</u>. at 111. In the instant case, it was not unreasonable for the state postconviction court to conclude that Petitioner's evidence of prejudice fell short of this standard. It is simply too tenuous to allege that actions of formerly retained counsel at a <u>Williams</u> rule hearing affected the subsequent decision to enter a plea with newly retained counsel. As concluded by the postconviction court, no hypothetical expert witness would be able to offset the central, uncontroverted facts of this case, to wit: Petitioner sent videos of himself masturbating to H.W. while H.W. was a minor; Petitioner received and saved numerous pictures and videos of H.W. engaging in sexual acts while H.W. was a minor; he engaged in various sexual acts with M.W. while she was a minor; and he

repeatedly attempted to contact both victims despite court orders to the contrary. It strains credulity to suggest that Petitioner would have rejected the plea offer, and/or would have received an even slightly shorter sentence, if only Mr. Baker would have produced a digital forensics expert at the <u>Williams</u> rule hearing.

In short, Petitioner failed to demonstrate a reasonable probability that, but for counsel's failure to produce an digital forensics expert witness to challenge the <u>Williams</u> rule testimony of Brian Barnhart, he would have elected to go to trial and/or would have received a more lenient sentence. As there was a reasonable basis for the state postconviction court to deny relief on this claim, the state court's adjudication was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Alternatively, although the postconviction court did not deny this claim as procedurally barred, Respondents submit that Petitioner's claim of ineffective assistance of trial counsel in Ground Four was waived by the entry of his plea. On the written plea form, the clause entitled "Specific Terms of Negotiated Sentence," contains the following handwritten language: "I waive all rights to appeal any rulings on pre-trial motions." (Ex. A, 266). The "Advice of Rights" paragraph provides in pertinent part:

<u>Advice of Rights</u>:

I understand that by pleading guilty I give up the following constitutional rights: the right to trial by judge or jury (including my right to testify or not testify as I may choose), the right to be represented by counsel at trial, the right to have counsel appointed to represent me if I cannot afford to retain counsel, <u>the right to present witnesses in my own behalf and to compel the attendance of those witnesses,</u> the right to confront the witnesses against me, the right to require the State to prove its case against me beyond a reasonable doubt and, for purposes of this plea hearing, my right against self-incrimination. . . . I also understand that by entering this plea I give up the right to appeal all matters relating to the judgment, including the issue of guilt or innocence.

(Ex. A, 268).  The paragraph entitled "Consultation with Attorney" provides:

<u>Consultation with Attorney</u>:

I have had ample time to discuss this agreement with my attorney. My attorney and I have read this agreement regarding my guilty plea together in private, and my attorney has explained all portions of this agreement to my complete understanding and satisfaction. We have fully discussed all aspects of the case, including all possible defenses to all charges, including alibi, self-defense and any defense based upon any disability, disease, insanity, or intoxication. . . . My attorney has given me the opportunity to ask questions and has answered all of my questions fully and completely. My attorney has taken all actions requested by me, or has explained to my satisfaction and agreement why such actions should not be taken, and I concur with my attorney's decisions in that regard. I am completely satisfied with the services rendered by my attorney on my behalf in this case.

(Ex. A, 136).  The paragraph titled "Time for Consideration and Reflection" provides:

<u>Time for Consideration and Reflection</u>

> I have had sufficient time to consider all charges against me, all possible defenses and circumstances in mitigation, the advice of my attorney, the constitutional rights forfeited by entering into this plea agreement, and the potential consequences that the plea of guilty may have upon me. I have been provided with the opportunity for additional time to consider and reflect upon these matters, and I specifically state that I do not require any additional time to do so. I wish to proceed with the entry of my guilty plea. I understand that if I have any questions I should direct them to the Court at this time. All of my statements to the Court have been the complete truth.

(Ex. A, 268).

At the outset of the plea hearing, Mr. O'Mara informed the court that Petitioner was waiving his right to appeal any issues regarding the <u>Williams</u> rule decision by the court as well as any claim concerning the search warrant issued regarding the cell phone and subsequent evidence found. Mr. O'Mara stated that those and any other appellate rights or remedies Petitioner otherwise may have were waived by entry of the plea. (Ex. H, 4-5). Petitioner was sworn and attested that he had enough time to speak with his lawyer and did not need additional time to speak about his decision to plea or its consequences, that nobody threatened or promised anything in return for his plea, that he was entering his plea in both cases because he believed it was in his best interest to do so, that he understood the sentencing guidelines called for a prison term between 58.29 up to life without parole, that his negotiated sentence would be between 10-20 years with the possibility of probation for a period deemed proper by

the court, and that he read the written plea and understood the rights he was giving up including the right to appeal the ruling concerning the Williams rule evidence. (Ex. H, 7-20, 23). The prosecutor read the factual basis into the record, including that the State would be prepared to prove at trial that between August 18, 2011, and August 17, 2013, he knowingly transmitted videos of himself masturbating to H.W. who was known to him to be a minor, and that between the dates of October 1, 2012, and June 16, 2014, he knowingly possessed photos and videos he knew included sexual conduct by H.W. and possessed ten or more images of child pornography. (Ex. H, 20-21).

In Florida, a defendant's plea cuts off all inquiry into matters that precede it; thus a defendant is barred from contesting events that happened before the plea. See Holmes v. Secretary, Florida Dept. of Corrections, Case No. 5:13cv49/MCR/EMT, 2014 WL 684685, at *9-11 (N.D. Fla. Feb. 21, 2014)(citing Smith v. State, 41 So. 3d 1037, 1040 (Fla. 1st DCA 2010), Clift v. State, 43 So. 3d 778, 779-780 (Fla. 1st DCA 2010), Stano v. State, 520 So. 2d 278, 279-280 (Fla.1988), and Davis v. State, 938 So. 2d 555, 556-557 (Fla. 1 st DCA 2006)). A voluntary and intelligent guilty plea forecloses federal collateral review of alleged constitutional errors preceding the entry of the plea, including claims of ineffective assistance that do not attack the voluntariness of the plea. Newsome v. Secretary, Dept. of Corrections, Case No.

5:12-cv-42-MP-GRJ, 2015 WL 1245786, at *8-9 (N.D. Fla. March 18, 2015)(citing

Tollett v. Henderson, 411 U.S. 258, 266-267 (1973)); Wilson v. United States, 962

F.2d 996, 997 (11th Cir.1992); Smith v. Estelle, 711 F.2d 677, 682 (5th Cir.1983)).

Here, Petitioner knowingly and voluntarily entered his plea and he knew all of the

alleged deficiencies of trial counsel, particularly those he now alleges occurred at the

Williams rule hearing prior to entry of his plea. By entering his plea, he waived all

claims of ineffective assistance of counsel not related to the plea and the

circumstances surrounding the plea. By this waiver, he was precluded from

challenging defense counsel's representation at the Williams rule hearing. See e.g.,

Stano v. State, 520 So. 2d 278, 279-280 (Fla. 1988).

As mentioned, the postconviction court herein did not rely on any waiver or bar

in disposing of Ground Four. Nevertheless, for purposes of this federal habeas

proceeding, Respondents expressly assert this procedural bar to Petitioner's claim of

ineffective assistance of counsel in Ground Four. The postconviction court should not

have considered Ground Four on the merits. The state court's rejection of this claim

was not  contrary to clearly established federal law, did not involve an unreasonable

application of clearly established federal law, and was not based on an unreasonable

determination of the facts in light of the evidence presented in the state court

proceedings. Ground Four should be denied.

## GROUND FIVE: "CUMULATIVE ERROR."

PETITIONER'S CLAIM

Petitioner alleges that all of the errors committed by counsel in his case, considered either individually or together, resulted in his being denied a fair proceeding. Petitioner cites cases from the 9th and 10th Circuits for the proposition that where no single error or omission of counsel, standing alone, significantly impairs the defense, the district court may nonetheless find unfairness and thus, prejudice emanating from the totality of counsel's errors and omissions.

A.  EXHAUSTION OF STATE REMEDIES

Petitioner raised this claim as Ground Five of his postconviction motion (Ex. T, 102-103), and appealed the denial of this claim. (Ex. U).

B.  ARGUMENT

In Ground Five of his postconviction motion, Petitioner raised the same claim he raises in Ground Five of his federal habeas petition. (Ex. T, 102-103). The trial court summarily denied this claim as follows:

### GROUND FIVE

In Ground Five of his motion, Defendant raises a claim of cumulative error/cumulative prejudice. Defendant's claim fails as a matter of law.

The Florida Supreme Court "has recognized under unique circumstances that where multiple errors are found, even if deemed harmless individually, the cumulative effect of such errors may deny to the defendant the fair and impartial trial that is the inalienable right of all litigants." Wright v. State, 213 So. 3d 881 (Fla. 2017) (internal quotations omitted) (emphasis added). However, "[c]laims of cumulative error do not warrant relief where each claim of error is either meritless, procedurally barred, or does not meet the Strickland standard for ineffective assistance of counsel." Schoenwetter v. State, 46 So. 3d 535, 562 (Fla. 2010) (internal quotation omitted).

Here, there are not multiple errors for this Court to aggregate. As such, Defendant's cumulative error claim necessarily fails and this Court denies Ground Five of Defendant's motion. See Downs v. State, 740 So. 2d 506, 509, n.5 (Fla. 1999) ("Claim (14), which alleges cumulative error, is without merit because we have considered all of the errors alleged by Downs and find none of them sufficient to warrant an evidentiary hearing in this case.").

(Ex. T, 102-103). The 1st DCA affirmed per curiam without a written opinion. (Ex. W).

The United States Supreme Court has not recognized the cumulative error doctrine in the context of ineffective assistance of counsel claims. The Eleventh Circuit has noted the absence of Supreme Court precedent applying cumulative error doctrine to claims of ineffective assistance of counsel. Forrest v. Fla. Dep't of Corr., 342 Fed. Appx. 560 (11th Cir. 2009):

Forrest argues that defense counsel committed multiple errors, largely related to investigation and preparation for trial. Forrest argues that, when viewed in aggregate, these errors amount to ineffective assistance. The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the

context of an ineffective assistance of counsel claim. However, the Supreme Court has held, in the context of an ineffective assistance claim, that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." United States v. Cronic, 466 U.S. 648, 659 n.26, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

Forrest raised his cumulative error argument before the state court. The state court concluded that none of Forrest's alleged individual errors amounts to ineffective assistance of counsel. Thus, the state denied Forrest's claim of cumulative error by relying on the Florida Supreme Court's holding in Parker v. State, 904 So. 2d 370 (Fla. 2005), which stated that "where the individual claims of error alleged are ... without merit, the claim of cumulative error also necessarily fails." Id. at 380.

In the present appeal, Forrest lists alleged failures by counsel, but does not establish prejudice or the collective effect of these errors on the trial. In light of Cronic and the absence of Supreme Court precedent applying the cumulative error doctrine to claims of ineffective assistance of counsel, the state court's holding is not contrary to or an unreasonable application of clearly established federal law. Accordingly, the district court did not err in determining that Forrest's cumulative error argument lacked merit.

Id. at 564-565 (footnote omitted).

Cumulative error analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. See United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (where no individual errors have been demonstrated, no cumulative errors can exist); United States v. Barshov, 733 F.2d 842, 852 (11th Cir. 1984)("Without harmful errors, there can be no cumulative effect compelling reversal."); Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites

no authority in support of his assertion, which, if adopted, would encourage habeas

petitioners to multiply claims endlessly in the hope that, by advancing a sufficient

number of claims, they could obtain relief even if none of these had any merit. We

receive enough meritless habeas claims as it is; we decline to adopt a rule that would

have the effect of soliciting more and has nothing else to recommend it. Twenty times

zero equals zero."). See also, United States v. Hall, 455 F.3d 508, 520 (5th Cir.

2006); Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (where there is no

single constitutional error, nothing can accumulate to the level of a constitutional

violation); United States v. Hardy, 224 F.3d 752, 757 (8th Cir. 2000); Moore v.

Reynolds, 153 F.3d 1086, 1113 (10th Cir. 1998); United States v. Rivera, 900 F.2d

1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the

effect of matters determined to be error, not the cumulative effect of non-errors.");

United States v. Conteh, 234 Fed. Appx. 374, 389 (6th Cir. 2007)(a cumulative-error

analysis should evaluate only the effect of matter or matters determined to be in error,

not the cumulative effect of non-errors).

   In the instant case, none of the alleged errors of trial counsel, considered alone,

approaches the threshold standard of ineffective assistance of counsel. Taken

together, their cumulative effect also falls far short of depriving Petitioner of effective

assistance of counsel or a fundamentally fair trial.  Therefore, Petitioner is not entitled

to federal habeas relief on his cumulative error claim. See Ballard v. McNeil, 785 F.

Supp. 2d 1299, 1335-1337 (N.D. Fla. 2011)(11th Circuit has never expressly recognized a freestanding "cumulative effect" claim based on the assertion that alleged errors of the trial court, defense counsel, or the State or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable under § 2254).

The state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground Five should be denied.

### GROUND SIX: "MULTIPLE CONDITIONS OF PETITIONER WRIGHT'S PROBATION ARE ILLEGAL AS BEARING NO RELATIONSHIP TO THE CRIMES FOR WHICH PETITIONER WRIGHT WAS CONVICTED."

PETITIONER'S CLAIM

Petitioner alleges that the following four conditions of his probation are illegal: (1) mandatory curfew from 11:00 p.m. to 7:00 a.m. daily; (2) maintain a driving log; (3) must not access the internet or other computer services or social media; and (4) must not consume alcohol and must attend two AA meetings a week. Petitioner asserts that these four conditions are improper based on the three-part test set out by the Florida Supreme Court in Biller v. State, 618 So. 2d 734 (Fla. 1993), as they are

not related to the crimes for which he was convicted, relate to conduct which is not criminal, and are not reasonably related to future criminality. As to the condition prohibiting access to the internet or other computer services or social media, Petitioner asserts that the United States Supreme Court in 2017 struck down a similar provision in North Carolina as impermissibly preventing a person from engaging in the legitimate exercise of First Amendment rights. <u>Packingham v. North Carolina</u>, 137 S.Ct. 1730 (2017).  Petitioner alleges that the state court's rejection of this claim was contrary to and an unreasonable application of the Supreme Court's decision in <u>Packingham</u>, and his constitutional rights, and was based on an unreasonable determination of the facts in light of the evidence contained in the state court record.

A.  <u>ARGUMENT</u>

Petitioner first challenged these four conditions of probation in his 3.800 motion to correct illegal sentence, asserting that the conditions are illegal as bearing no relationship to the crimes for which he was convicted, as not being in and of themselves criminal, and as not reasonably related to future criminality. He cited Florida law in support of these arguments. As to the condition prohibiting access from computer services or social media, he cited the Supreme Court's decision <u>Packingham</u> and the First Amendment, U.S. Constitution.  (Ex. Q). The trial court denied the claim on the basis that such a claim is not cognizable under Rule 3.800(a) which is limited

to those sentencing issues that can be resolved as a matter of law without an evidentiary hearing. The court went on to specifically reject the First Amendment challenge on the merits, finding that <u>Packingham</u> involved a North Carolina statute which flatly prohibited registered sex offenders from accessing all social media web sites, whereas in Petitioner's case Petitioner agreed to this blanket prohibition as part of his negotiated plea deal. The court stated that Florida, as part of the statutory restrictions on registered sex offenders and the requirements of sex offender probation, has no such blanket prohibition on accessing social media or using the internet. § 948.30(1)(h), Fla. Stat. (prohibition on accessing internet while on sex offender probation until risk assessment performed by qualified practitioner in sex offender treatment program); § 943.0435, Fla. Stat. (requirements for individuals deemed sex offenders). The court stated that by entering his plea of convenience, Petitioner made a choice to limit or otherwise waive his First Amendment rights presumably in exchange for a lighter sentence than what he could have otherwise received and, thus, <u>Packingham</u> was not controlling. (Ex. R). Petitioner did not appeal this order.

Petitioner subsequently challenged these same four conditions of probation in Ground Six of his postconviction motion. He cited only state law and asserted solely that the conditions are illegal as bearing no relationship to the crimes for which he

was convicted. He did not cite <u>Packingham</u> or present any federal claim. (Ex. T, 87-89).

The postconviction court summarily denied this claim as follows:

<u>GROUND SIX</u>

In Ground Six of his motion, Defendant argues that multiple conditions of his probation are illegal. The four probation conditions Defendant argues are unlawful are: (a) observation of a mandatory curfew from 11 PM to 7 AM daily; (b) maintenance a driving log; (c) refrain from accessing the internet or other computer services or social media; and (d) abstain from the consumption of alcohol and attend two Alcoholics Anonymous meetings per week. (Ex. B.)

In support of his claim, Defendant cites to <u>Biller v. State</u>, 618 So. 2d 734 (Fla. 1993). In <u>Biller</u>, the Florida Supreme Court held that a probation condition is invalid if it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality." <u>Id</u>. at 734-35 (quoting <u>Rodriguez v. State</u>, 378 So. 2d 7, 9 (Fla. 2d DCA 1979)). Defendant argues that the four probation conditions listed above do not comport with the <u>Biller</u> factors. Defendant's argument is without merit.

First, the conditions that require Defendant to observe an eight-hour overnight curfew, maintain a driving log, and refrain from accessing the internet are *standard* probation conditions for offenders placed on probation for a sex offense. (Ex. J.) Defendant pled guilty to multiple violations of, *inter alia*, sections 794.011(8)(b) and 827.071(5), Florida Statutes. (Ex. A; Ex. B; Ex. F.) Section 948.30(l)(a), Florida Statutes, provides that an eight-hour overnight curfew is a standard condition of sex offender probation. Section 948.30(2)(b), Florida Statutes, provides that the maintenance of a driving log is a *mandatory* condition of sex offender probation. Section 948.30(1)(h), Florida Statutes, provides

that prohibiting an offender's internet access is a standard condition of sex offender probation. See also Levandoski v. State, 245 So. 3d 643 (Fla. 2018) (upholding the sentencing court's imposition of a special probation condition that prohibited the defendant from accessing the internet, possessing a computer or any electronic device that he could use to access the internet, or having an email address or other similar type of address that would allow him to carry on internet-based conversations). As the Biller Court observed, "[t]here are many general conditions imposed upon most, if not all, probationers which are broadly directed toward supervision and rehabilitation. The requirements of Rodriguez v. State, 378 So. 2d 7 (Fla. 2d DCA 1979), are not *applicable* to these conditions." Biller, 618 So. 2d at 735, n. 1 (emphasis added). These authorities demonstrate that Defendant's overnight curfew, driving log, and internet probation conditions are lawful. Additionally, Defendant expressly agreed to each of these conditions on both his written plea form and during his plea colloquy with the trial court as part of his negotiated sentence. (Ex. A; Ex. F at 15-17.)

Finally, there is nothing illegal about the probation condition that both precludes Defendant from consuming alcohol and requires Defendant to attend weekly A.A. meetings. Defendant expressly agreed to this condition as part of his negotiated sentence. (Ex. A; Ex. F at 17.) Moreover, the record in this case demonstrates that the condition withstands a Biller analysis. At his sentencing hearing, Defendant informed the court that his criminal conduct was attributable in part to his unhappiness in his marriage and his "problem with alcohol." (Ex. D at 72.) Defendant also agreed that, on June 16, 2014,  he sent an electronic message to his wife in which he described himself as being a "self-destructive drunk for the past seven years." (Ex. D at 57-58.)  These facts show that the alcohol probation condition at issue has a clear relationship to Defendant's crimes. As such, the condition comports with Biller. See Villanueva v. State, 200 So. 3d 47, 53 (Fla. 2016) ("In other words, a condition is valid if it satisfies one of the following Biller factors: (1) has a relationship to the crime for which the offender was convicted ...."). As such, this Court denies Ground Six of Defendant's motion.

(Ex. T, 103-105)(footnote omitted)(emphasis in original).

In his brief on appeal from the denial of postconviction relief, Petitioner cited Florida case law, <u>Biller</u> and progeny, in arguing that the postconviction court improperly denied Ground Six. In addition, in discussing the prohibition against internet access, Petitioner briefly referenced <u>Packingham</u> and the First Amendment for the first time where he had not made a federal claim in Ground Six of the 3.850 motion. (Ex. U, 41-50). The 1st DCA affirmed per curiam without a written opinion. (Ex. W).

No cognizable federal claim

Petitioner challenges four conditions of his probation. With respect to (1) mandatory curfew from 11:00 p.m. to 7:00 a.m. daily; (2) maintain a driving log; and (4) must not consume alcohol and must attend two AA meetings a week, he raises solely a state law claim. Thus, Petitioner has raised no cognizable federal claim regarding these three conditions.

Federal claim not exhausted

With respect to his claim regarding Condition (3) restricting internet or social media access, Petitioner cited <u>Packingham</u> and the First Amendment in his rule 3.800 motion but not in his 3.850 motion. To the extent that Petitioner did raise a federal

claim in his 3.800 motion, the court specifically addressed and rejected this claim, finding <u>Packingham</u> did not control under the circumstances of Petitioner's case. Petitioner did not appeal the trial court's rejection of his federal claim and thus failed to exhaust it in state court.

In his 3.850 motion, Petitioner did not raise a federal claim whatsoever and thus the postconviction court was not asked to address any federal claim. Respondents submit that Petitioner failed to properly exhaust his federal claim in state court under these circumstances, and that his attempt to cite <u>Packingham</u> on appeal of the denial of Ground Six was insufficient to exhaust the claim where the postconviction court was not asked to address a federal claim in Ground Six.

Petitioner's procedural default of this claim in state court bars consideration in federal habeas review.  Petitioner has not shown cause and prejudice for the default, and there is nothing in the record that suggests a fundamental miscarriage of justice would result if this Court did not consider the claim.  Ground Six should be denied.

## <u>CONCLUSION</u>

Respondents respectfully request that this Honorable Court deny any and all relief requested in the petition.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

*/s/ Anne C. Conley*
ANNE C. CONLEY
Assistant Attorney General
Florida Bar No. 0770670

Pl-01, the Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 922-6674 (Fax)
Anne.Conley@myfloridalegal.com
COUNSEL FOR RESPONDENTS
[AGO #L20-1-07064]

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing Answer to Petition for Writ of Habeas Corpus with the Clerk of Court by using the CM/ECF system, effecting service on counsel for Petitioner, Michael Ufferman and Joseph S. Hamrick, at ufferman@uffermanlaw.com and joseph.s.hamrick@gmail.com, on September <u>30</u>, 2021.


/s/ Anne C. Conley
ANNE C. CONLEY
Assistant Attorney General

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DANIEL G. WRIGHT,

       Petitioner,

v.

SECRETARY, FLORIDA
DEPARTMENT OF
CORRECTIONS, et al.,

      Respondents.

CASE NO. 3:20-cv-777-BJD-JBT

## APPENDIX

A.    Trial Court Record (Volumes I-IV)
B.    Trial Court Record (Volumes V-VI)
C.    Trial Court Record (Volume VII)
D.    Trial Court Record (Volume VIII)
E.    Trial Court Record (Volume IX - Transcript of Sentencing Hearing)
F.    Trial Court Record (Volume X)
G.    Trial Court Record (Volumes XI-XX)
H.    Trial Court Record (Volume XXI- Transcript of Plea Hearing)
I.    Trial Court Record (Volume XXII)
J.    Trial Court Record (Volume XXIII - Transcript of Williams rule hearing)
K.    Trial Court Record (Volume XXIV)
L.    Initial Brief
M.    Answer Brief
N.    Reply Brief
O.    1st DCA Per Curiam Affirmance (1D16-1370)
P.    1st DCA Mandate (1D16-1370)
Q.    3.800(a) Motion
R.    Order Granting 3.800(a) Motion
S.    Amended Judgment and Sentence

T.      Postconviction Record
U.      Initial Brief
V.      State's Notice of Filing No Answer Brief
W.     1st DCA Per Curiam Affirmance (1D19-2490)
X.      Motion for Rehearing and Issuance of Written Opinion
Y.      Order Denying Rehearing and Issuance of Written Opinion
Z.      1st DCA Mandate (1D19-2490)